# THOMPSON *v.* MAXWELL LAND GRANT AND RAILWAY COMPANY.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF NEW MEXICO.

No. 91.   Argued November 2, 3, 1897. — Decided December 6, 1897.

That which has been decided on one appeal or writ of error, cannot be reëxamined on a second appeal or writ of error, brought in the same suit.

Whenever a case comes from the highest court of a State for review, and, by statute or settled practice in that State, the opinion of the court is a part of the record, this court may examine such opinion for the purpose of ascertaining the grounds of the judgment.

Although the judgment and the mandate in a given case in this court express its decision, it may examine the opinion for the purpose of determining what matters were considered, upon what grounds the judgment was entered, and what has become settled, for the future disposition of the case.

In the former decision of this case, 95 U. S. 391, the decree was reversed on the ground that the bill, as it stood, was technically a bill of review; but it was further decided that certain matters then in issue were sufficiently and effectually determined by the proofs already in, and the reversal did not throw open the case for additional proofs upon such matters.

An infant is ordinarily bound by acts done in good faith by his solicitor or counsel in the course of the suit, to the same extent as a person of full age; and a decree made in a suit in which an infant is a party, by consent of counsel, without fraud or collusion, is binding upon the infant and cannot be set aside by rehearing, appeal or review.

A compromise made in a pending suit which appears to the court to be for the benefit of an infant, party to the suit, will be confirmed without reference to a master; and, if sanctioned by the court, cannot be afterwards set aside except for fraud.

THE facts in this case are as follows: In 1841 the Republic of Mexico made a grant to Charles Beaubien and Guadalupe Miranda of a large tract of land, generally known of late as the Maxwell Land Grant; so known because Lucien B. Maxwell, having acquired title from Beaubien and Miranda or their heirs, was, or at least claimed to be, for many years the sole owner. In September, 1859, the heirs of Charles Bent, namely, Alfred Bent and his two sisters, Teresina Scheurick

and Estefana Hicklin, brought a suit in the District Court for the county of Taos in the Territory of New Mexico, against Beaubien, Miranda and Maxwell, claiming that under a parol contract their father, Charles Bent, was interested with Beaubien and Miranda in the ownership of the grant, and praying that such interest be established and decreed, and that it be also set off to them by partition. In June, 1865, upon the pleadings and proofs the court decreed to them an undivided fourth part of the grant, and appointed commissioners to make partition, giving specific directions for their guidance. Nothing was done under this decree. Soon thereafter negotiations were entered into between plaintiffs and Maxwell for a compromise of the litigation on the basis of Maxwell paying them a money consideration to relinquish their claim. It was agreed by the three plaintiffs that Alfred Bent and Aloys Scheurick, the husband of one of the sisters, should act in the matter as their agents to sell to Maxwell for the best price they could obtain, but never less than $21,000, or what Beaubien's heirs received. This compromise was advised and approved by their counsel. A conference was had in September or October, 1865, at Maxwell's residence, at which Alfred Bent demanded $21,000 and Maxwell offered $18,000. Alfred Bent returned from that conference to Taos, where the family resided, without having effected a definite agreement as to the price. The plaintiffs, however, considered the sale as good as made, but Alfred Bent advised his co-plaintiffs that they could get a few thousands more by being quiet a few days, insisting, however, on having as much as the Beaubien heirs should receive. The plaintiffs expected to close the bargain in a few days, were ready to make the deeds as soon as the matter was settled, and the deeds were in fact written out by Scheurick, the husband of one of the plaintiffs. Before the compromise was consummated and on December 15, 1865, Alfred Bent died, leaving surviving him his widow, Guadalupe Bent, and three infant children, Charles, Julian and Alberto Silas, aged respectively six, four and one years. On April 12 his widow was appointed administratrix of his estate and qualified. Just before his death Alfred Bent made a will, by

which he gave and bequeathed to his wife, "for the maintenance of her and my three children, Charles, Julian and Silas Bent, all of my real and personal property." But this will was not presented until March, 1867, when it was approved and admitted to probate. Beaubien, one of the original grantees, had left six children surviving. Maxwell married one of them, and between April 4, 1864, and January 1, 1870, purchased the interests of the other five for a consideration of not more than $3500 each. On April 9, 1866, the death of Alfred Bent was suggested, and his minor children and heirs, Charles, Julian and Alberto Silas, were by order of the court substituted as complainants in place of their father. On April 12, the mother of these minors, Guadalupe Bent, was by the court appointed guardian *ad litem* and commissioner in chancery for such minors, with full power to execute deeds or carry into execution all sales or transfers made of their interest in and to the real estate described in the suit to Lucien B. Maxwell. A settlement with Maxwell was concluded by Aloys Scheurich, acting for his wife, his wife's sister and her husband, and the widow as guardian *ad litem* for the minor children of Alfred, which was acceptable to all the parties, by which Maxwell was to pay the sum of $18,000 for the conveyance of the interest of the Bent heirs. This compromise was advised by their leading counsel. In May the two sisters, by separate deeds, conveyed their interests to Maxwell, and during the same month Guadalupe Bent, as guardian *ad litem* and reciting the order of April 12, also executed to Maxwell a conveyance of the interest of the minors. Each of these conveyances purported to be for the sum of $6000. At the next term of the court, about four months after the execution and delivery of these deeds, and on September 10, 1866, a further order or decree was entered, which read as follows :

" Whereas an interlocutory decree was rendered at a former term of this court in the above cause, decreeing one fourth of the land mentioned in the petition herein to the complainants in this cause, and appointing commissioners to divide and set apart the portion so decreed, and whereas said interlocutory decree was never carried into effect, and whereas since the

time of the rendition of said decree a mutual agreement has been made between the parties to this cause, settling and determining all the equities to the same:

"It is therefore hereby ordered, adjudged and decreed by the mutual consent and agreement of the said complainants as well as of the said defendants in this cause, that the interlocutory decree above mentioned, together with all orders made under and by virtue of the same, be set aside; and, by the mutual consent and agreement of the said parties, it is hereby further ordered, adjudged and decreed that the said Lucien B. Maxwell, one of the defendants in this cause, pay to the said complainants the sum of eighteen thousand dollars, to be divided among them *per stirpes*, that is, to the said Aloys Scheurick and Teresina Bent, his wife, one third part, and to Alexander Hicklin and Estefana Bent, his wife, another third part, and to Charles Bent, Julian Bent and Alberto Silas Bent, the children and heirs of Alfred Bent, deceased, the remaining third part, to be equally divided among the said last named and to be paid into the hands of Guadalupe Bent, widow of the — Alfred Bent, deceased, and guardian *ad litem* for said children for the purposes of the said division.

"And upon the further consent and agreement of the said parties, it is hereby further ordered, adjudged and decreed, that the said Alexander Hicklin and Estefana Bent, his wife, the said Aloys Scheurick and Teresina Bent, his wife, and the said Guadalupe Bent, guardian, *ad litem*, for Charles Bent, Julian Bent and Alberto Silas Bent, children and minor heirs of the said Alfred Bent, deceased, within ten days from the day of the date of this decree, make, execute and deliver to the said Lucien B. Maxwell good and sufficient deeds of conveyance of all their right, title, interest, estate, claim and demand of, in and to the lands in controversy in this cause; the said Guadalupe Bent, guardian *ad litem* as aforesaid, in the name of Charles Bent, Julian Bent and Alberto Silas Bent, minor heirs as aforesaid, and the said Alexander Hicklin and Estefana Bent, his wife, and the said Aloys Scheurick and Teresina Bent, his wife, in their own names. And by further consent and agreement between the said parties, it is hereby further ordered, adjudged

and decreed, that the costs of this suit shall be paid, each of the said parties to pay the separate costs in the same made by themselves."

In April, 1870, Maxwell, claiming to have the full title to the entire grant, conveyed all except a few acres to the Maxwell Land Grant and Railway Company. In August of that year Maxwell and the Maxwell Company filed a bill in the District Court against the appellants Guadalupe Thompson and her husband, (the former being the widow of Alfred Bent, who had since intermarried with George W. Thompson,) and the three minor children of Alfred Bent, which, after reciting in a general way the history of the grant and the proceedings in the former suit, alleged that it was doubtful whether the order and decree of September, 1866, fully expressed the agreements of the parties, or fully cancelled and discharged all claims that the infant heirs of Alfred Bent had in the land, and prayed that the defendants be adjudged to have no interest in or title to the premises, equitably or otherwise, and that the plaintiffs' title be quieted. Subsequently the bill was amended, and thereafter, the defendants having answered and proofs having been taken, a decree was entered sustaining the prayer of the bill and quieting the title of the plaintiffs in the premises. This decree was affirmed on appeal by the Supreme Court of the Territory, but on further appeal to this court was reversed, 95 U. S. 391, and the case remanded to the territorial courts for further proceedings. Subsequent proceedings having been had therein a new decree was entered by the District Court in favor of the plaintiffs, which on appeal to the Supreme Court of the Territory was affirmed, and from such decree of affirmance this appeal has been taken.

*Mr. John G. Carlisle* for appellants. *Mr. S. D. Rouse, Mr. James O'Hara, Mr. Caldwell Yeaman, Mr. E. T. Wells, Mr. R. T. McNeal, Mr. John G. Taylor* and *Mr. Logan Carlisle* were with him on the briefs.

*Mr. Frank Springer* and *Mr. A. B. Browne* for appellees. *Mr. A. T. Britton* was with them on the brief.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

It is the settled law of this court, as of others, that whatever has been decided on one appeal or writ of error cannot be reëxamined on a second appeal or writ of error brought in the same suit. The first decision has become the settled law of the case. *Supervisors* v. *Kennicott*, 94 U. S. 498, and cases cited in the opinion; *Clark* v. *Keith*, 106 U. S. 464; *Chaffin* v. *Taylor*, 116 U. S. 567; *Northern Pacific Railroad* v. *Ellis*, 144 U. S. 458; *Great Western Telegraph Company* v. *Burnham*, 162 U. S. 339, 343.

Whenever a case comes from the highest court of a State for review, and by statute or settled practice in that State the opinion of the court is a part of the record, we are authorized to examine such opinion for the purpose of ascertaining the grounds of the judgment. *N. O. Water Works Co.* v. *Louisiana Sugar Refining Co.*, 125 U. S. 18; *Kreiger* v. *Shelby Railroad*, 125 U. S. 39; *Egan* v. *Hart*, 165 U. S. 188. We take judicial notice of our own opinions, and although the judgment and the mandate express the decision of the court, yet we may properly examine the opinion in order to determine what matters were considered, upon what grounds the judgment was entered and what has become settled for further disposition of the case.

We, therefore, turn to the former opinion and the mandate to see what was presented and decided. The ground upon which the reversal was ordered was that the bill as presented, especially after the amendment, was technically a bill of review, and as such could not be maintained for three reasons: First, because the decree sought to be reviewed was a consent decree; secondly, because the bill was filed on behalf of an assignee of the original defendant; and, thirdly, because it sought a modification of the decree upon a matter of fact not appearing upon the record, without alleging any newly discovered evidence unknown to the parties before that decree. The opinion by Mr. Justice Bradley gives a full history of the litigation, the substance of the allegations in the bill of com-

plaint, and points out why, especially after the amendment, it must be regarded as a bill of review. The amendment put into the prayer these words: "That for the aforesaid errors of law, apparent on the face of the said decree of 10th September, 1866, the same may be reviewed and reversed in the points herein complained of." But after demonstrating that the bill as it stood must be deemed a bill of review, and not sustainable, the opinion proceeds:

"Nevertheless, the general purpose which it evidently had in view — the quieting of the title to the land in question — is one towards which a court of equity is always liberally disposed, as tending to promote the peace of society and the security of property. And if, instead of seeking to reverse the decree of September, 1866, (which, for like reasons of public policy, as applicable to the security of judgments that have passed into *rem adjudicatam*, is not allowable,) the bill had sought to carry that decree more effectually into execution, it would have been free from legal objections, and equally conducive to the object in view."

And then, after quoting from Lord Redesdale, it adds:

"The bill in this case, as originally filed, before it was converted by amendment into a bill of review, and abating the allegations of error in the original decree, approximated to the character of such a bill as might have been sustained. The proofs show a case which, in our judgment, supports the conclusions of the decree, to the effect that the terms of compromise made by the adult parties to the suit (including the mother and guardian of the infant heirs of Alfred Bent) were advantageous to the said infants, and were so considered and accepted by the court in their behalf. But, so far as the present decree undertook to reverse and modify the decree of September, 1866, we think it is clearly erroneous. Still, although we feel obliged to reverse the present decree, we do not think that the bill should be absolutely dismissed. And, as the whole question between the parties has been fully litigated on the proofs, it would be unreasonable to require that these should be taken over again.

"Our conclusion is, that the present decree must be reversed

with costs, and that the cause be remanded to the court below, with directions to allow the complainants to amend their bill as they shall be advised, and with liberty to the defendants to answer any new matter introduced therein; and that all the proofs in the cause shall stand as proofs upon any future hearing thereof, with liberty to either party to take additional proofs upon any new matter that may be put in issue by the amended pleadings."

The mandate contained an order in the language of the last paragraph.

Although the former decree was reversed on the ground that the bill as it stood was technically a bill of review and could not, under the circumstances, be maintained, obviously the decision went beyond the determination of this matter. The case was not remanded with instructions to dismiss the bill as one not maintainable. It was decided that there were allegations in the bill which, if certain matters were stricken out, would make it properly one to more effectually carry into execution the consent decree of September, 1866, to establish beyond further controversy the settlement then made, and to quiet the title of the plaintiffs. It was also perceived and decided that the proofs already taken made out a case which justified such relief, and that while the proofs did not establish one of the principal facts set forth in the original bill, to wit, that the settlement was simply carrying into effect a compromise concluded with Alfred Bent, the father of the minors, during his lifetime, they did establish that such settlement made by the mother and guardian was advantageous to the infants, and was so considered and accepted by the court in their behalf. Not only was there no dismissal of the bill, but beyond that, the case was not opened for new proofs in respect to matters distinctly put in issue by the pleadings as they stood, and in respect to which it was determined that the proofs already in were sufficient. The plaintiffs were authorized to amend their bill, as they should be advised, but obviously this contemplated such amendments as would make the bill one of the character and scope indicated in the opinion. The defendants were given leave to

answer any new matter that should be introduced into the bill, thus impliedly excluding the right to make new answer to those matters which should not be changed. And further, while it was ordered that the proofs already taken should stand as proofs upon any future hearing, no leave was given to take further testimony upon the matters already in issue, but simply to make additional proofs upon any new matter that might be put in issue by the amended pleadings. Language could not be clearer to show that this court decided that certain matters then in issue were sufficiently and effectually determined by the proofs already in, and did not throw open the case for additional proofs upon such matters. To now consider the case as reopened in its entirety and to inquire whether each and all of the matters in issue are or are not established by the proofs, including those taken subsequently to the prior decision, would be to practically treat the case as entirely new, and ignore that which was considered and determined on the former hearing.

In the light of that decision it is not difficult to reach a conclusion upon the record as it now stands. When the case went back to the trial court the plaintiffs added no new matter to their bill. They made ten amendments, nine of which consisted simply in striking out certain paragraphs and sentences, and the tenth in transposing the position in the bill of one paragraph. There was, therefore, nothing new to which the defendants were called upon, or permitted by the decision, to make answer. The parts of the bill stricken out were such as tended to make it, according to the opinion of this court, technically a bill of review, and left it strictly such a bill as was approved of in that opinion. The defendants filed answers to the amended bill. These answers contained new matter. This new matter was substantially that the consent decree of September, 1866, was not made at the request or with the consent of the solicitor of the defendants or any of them, nor did the minors or any one having authority to represent them ever authorize any solicitor to consent to any decree for the transfer or surrender of their rights; that the pretended agreement and proceedings were fraudulent as

to the minors, and involved an unjust, erroneous and illegal sacrifice of their just and valid rights; that their interest in the grant alleged to have been sold, released or surrendered for the sum of $6000 was at that time worth not less than $100,000, and is now worth a much greater sum, and that the alleged settlement and compromise was not in any way beneficial or advantageous to the minors, or necessary for their support or maintenance. The record now brought before us contains none of the proofs taken and offered on the hearing, but only the findings of fact made by the court. This is in accordance with the procedure prescribed by statute for the review in this court of cases heard and determined in the territorial courts. It does appear, however, that after the return to the trial court of the mandate in this case, and on April 7, 1882, the children of Alfred Bent commenced an independent suit against the Maxwell Land Grant Company and all other parties supposed to have any interest in the grant, to establish their title to a one twelfth part of the estate; that issues were made up in that case and proofs taken, and that by consent of counsel the proofs taken in that case were used as proofs in this. The findings of fact in the two cases are substantially similar. In that a decree was entered dismissing the bill, and it is now pending in this court, the next case on its docket, and submitted and argued with this. It may well be considered within the scope of the prior decision that as no new matter was introduced into the plaintiffs' bill the defendants were not warranted in setting up any new defences, and that upon the issues as they stood after the amendments to the bill, striking out portions thereof and the proofs then taken, the only thing which the trial court ought to have done was to have entered a decree thereon quieting the plaintiffs' title in accordance with the views expressed by this court.

But passing that, and considering the case in the light of the issues as they stand upon the amended pleadings and the findings of fact made by the lower court, we are clearly of opinion that its decree in favor of the plaintiffs must be sustained. These findings show that in the lifetime of Alfred

Bent the counsel of himself and his two sisters advised them to settle with Maxwell rather than take the award of the commissioners; that on a conference between Alfred Bent, acting for himself and his sisters, and Maxwell, the former demanded $21,000 as the consideration of such settlement, and that Maxwell offered $18,000, a difference of $3000, or only $1000 for each of the three parties plaintiff; that while no definite agreement was then completed the Bents considered the sale as good as made, prepared deeds for carrying such settlement into effect, and only waited on the advice of Alfred Bent that by delaying a few days they might get more money, he insisting that they should receive as much as the Beaubien heirs obtained. The findings also show that the amount which was finally accepted was larger proportionately than that which the Beaubien heirs received for their interests; so that while it may be technically true that no settlement was accomplished during the lifetime of Alfred Bent, it does appear that negotiations had proceeded so far that the Bent heirs considered one accomplished, and prepared to carry it into effect. Scheurick and Hicklin, the husbands of Alfred Bent's two sisters, as well as the four husbands of the Beaubien heirs, who during these years sold and conveyed their interests to Maxwell for less sums proportionally than the Bent heirs received, were intelligent men, ranked among the best citizens of the community, and were considered men of wealth and influence, so the case is not one of an advantage taken of ignorance and inexperience. It further appears that the compromise as finally made was advised by the leading counsel for the Bent heirs; that the sisters, who were adults, with their husbands, executed deeds for the same amount, and have never since questioned the propriety and validity of the settlement. The findings also show that "at and about the year 1866, and for several years thereafter, there was no demand for or sales of undivided interests in lands of the quantity, character and location of those in question, such as to create any ascertainable market value thereof;" that the opinions of the witnesses examined in the present suit varied from two and one half cents to one dollar and twenty-five cents per acre, and that it

is impossible to satisfactorily ascertain or fix what was the value per acre of the grant at that time, the "value being largely speculative for the future." The court further expressly finds that the mother and guardian *ad litem* knew the character and scope of the instrument she was signing; knew that it was a settlement of the claims in favor of her children; was satisfied with the sum paid, and "that no fraud, imposition or error has been shown to have entered into said transaction, or to have brought about said compromise decree."

That infants are bound by a consent decree is affirmed by the authorities, and this notwithstanding that it does not appear that a prior inquiry was made by the court as to whether it was for their benefit. In 1 Dan. Ch. Pl. & Pr. 163, it is said:

"Although the court usually will not, where infants are concerned, make a decree by consent, without an inquiry whether it is for their benefit, yet when once a decree has been pronounced without that previous step, it is considered as of the same authority as if such an inquiry had been directed, and a certificate thereupon made that it would be for their benefit. In the same manner, an order for maintenance, though usually made after an inquiry, if made without would be equally binding." (In support of these propositions many authorities are cited in a note.) . . . "An infant defendant is as much bound by a decree in equity as a person of full age; therefore, if there be an absolute decree made against a defendant who is under age, he will not be permitted to dispute it, unless upon the same grounds as an adult might have disputed it; such as fraud, collusion or error."

In *Walsh* v. *Walsh*, 116 Mass. 377, a decree had been entered as follows: "And the plaintiff and the defendants, . . . Thomas Keyes, . . . and also in his capacity of guardian *ad litem* of Bridget Walsh and William Walsh, consenting to the following decree: And this court being satisfied upon the representations of counsel that the decree is fit and proper to be made as against the said Bridget and William; it is thereupon ordered, and adjudged, and decreed," etc. On

a bill of review filed by the minors this decree was challenged, among other reasons, on the ground that it appeared to have been made by consent of their guardian *ad litem* and upon the representations of counsel without proof. The court decided against the contention, and speaking in reference thereto, through Mr. Chief Justice Gray, said:

"An infant is ordinarily bound by acts done in good faith by his solicitor or counsel in the course of the suit, to the same extent as a person of full age. *Tillotson* v. *Hargrave*, 3 Madd. 494; *Levy* v. *Levy*, 3 Madd. 245. And a compromise, appearing to the court to be for the benefit of an infant, will be confirmed without a reference to a master; and, if sanctioned by the court, cannot be afterwards set aside except for fraud. *Lippiat* v. *Holley*, 1 Beav. 423; *Brooke* v. *Mostyn*, 33 Beav. 457, and 2 De G., J. & S. 373.

"If the court does pronounce a decree against an infant by consent, and without inquiry whether it will be for his benefit, he is as much bound by the decree as if there had been a reference to a master and a report by him that it was for the benefit of the infant. *Wall* v. *Bushby*, 1 Bro. Ch. 484; 1 Dan. Ch. Prac. 164. The case falls within the general rule, that a decree made by consent of counsel, without fraud or collusion, cannot be set aside by rehearing, appeal or review. *Webb* v. *Webb*, 3 Swanst. 658; *Harrison* v. *Rumsey*, 2 Ves. Sen. 488; *Bradish* v. *Gee*, Ambl. 229; *S. C.* 1 Keny. 73; *Downing* v. *Cage*, 1 Eq. Cas. Ab. 165; *Toder* v. *Sansam*, 1 Bro. P. C. (2d ed.) 468; *French* v. *Shotwell*, 5 Johns. Ch. 555."

Ordinarily indeed a court before entering a consent decree will inquire whether the terms of it are for the interest of the infants. It ought in all such cases to make the inquiry, and because it is its duty so to do it will be presumed, in the absence of any showing to the contrary, that it has performed its duty. In this case, while the decree fails to recite the making of such an inquiry, there is nothing to indicate that it was not made; the circumstances tend strongly to show that it was in fact made, and the finding is that the conclusion reached by the chancellor as to the advisability of the settlement was a sound exercise of his discretion. It is

true the findings show that this decree of September, 1866, was not made by the personal procurement, knowledge or consent of said Scheurick or Guadalupe Bent, and the fact of the entry thereof was unknown to them for several years thereafter. They also show that there is no pleading, order or proceeding of record disclosing whether or not any inquiry was made by the court; but it does appear that the parties plaintiff, including the infants, were represented by counsel; that the guardian *ad litem* as well as the other adult plaintiffs fully understood the settlement and assented to it; and it is not strange that, having executed conveyances, they left to counsel such further action as should be deemed necessary to perfect the transfer of title. Further, in April prior to this decree, not only was the suit revived in the name of the infant heirs of Alfred Bent, but, on motion of the solicitors for plaintiffs, their mother was appointed guardian *ad litem* and commissioner in chancery, with full power to execute deeds and carry into execution all sales or transfers of their interest in the real estate described to the defendant Maxwell. The court was, therefore, early advised of the fact of a proposed settlement. The consent decree shows fully the terms of the settlement, and it certainly is not straining the presumption in favor of judicial action to assume that the court would not have permitted the entry of this decree, providing for a settlement whose terms were thus disclosed, without being satisfied that such settlement was for the interest of the minors who were under its charge.

Again, the copy of the order directing the appointment of the mother as guardian *ad litem* and giving her authority to make the conveyance was incorporated into the deed which she knowingly executed, so that any inspection of the deed would have disclosed the fact that proceedings were being taken in court looking to the accomplishment of this compromise and settlement. There was no concealment or secrecy in the matter. In this connection we are referred to this paragraph in the opinion of the Supreme Court of the Territory, filed in the companion case to which we have heretofore referred:

"We do not enter into a discussion at large of the testi-

mony by which it is claimed that the decree of September, 1866, is successfully impeached upon the ground of fraud, and while we are not prepared, in view of the testimony submitted since the decision in *Thompson* v. *Maxwell*, 95 U. S. 400, to say that ' the proofs show a case which, in our own judgment, support the conclusions of the decree to the effect that the terms of the compromise made by the adult parties to the suit (including the mother and guardian of the infant heirs of Alfred Bent) were advantageous to the said infants and were so considered and accepted by the court in their behalf,' we do hold that the judgment of the court at that time in so considering and accepting said terms was shown to be a fair and reasonable exercise of the chancellor's discretion, and that no fraud, imposition or error has been shown to have entered into said transaction or to have brought about said compromise decree."

It will be seen from this that while the Supreme Court of the Territory, under the new proofs presented, was unable to express itself as strongly as this court had done, it did consider that the judgment of the chancellor in considering and accepting the terms of settlement was a fair and reasonable exercise of his discretion. In other words, that court seems to have been of the opinion that under the later testimony it could not be said that the settlement was in fact advantageous to the infants, but at the same time found that the chancellor not only made inquiry and considered the question of advantage, but also exercised fair and reasonable discretion in approving the settlement; and that, certainly, is all that is necessary to uphold a decree of a court. It would be strange, indeed, if, when those authorized to represent minors, acting in good faith, make a settlement of claims in their behalf, and such settlement is submitted to the proper tribunal, and after examination by that tribunal is found to be advantageous to the minors and approved by a decree entered of record, such settlement and decree can thereafter be set aside and held for naught on the ground that subsequent disclosures and changed conditions make it obvious that the settlement was not in fact for the interests of the minors, and that it would have been better for them to have retained rather than com-

promised their claims. If such a rule ever comes to be recognized it will work injury rather than benefit to the interests of minors, for no one will make any settlement of such claims for fear that it may thereafter be repudiated. The best interests of minors require that things that are done in their behalf, honestly, fairly, upon proper investigation and with the approval of the appropriate tribunal, shall be held as binding upon them as similar action taken by adults.

Again, it is said that it appears from the findings that the guardian *ad litem* was a Mexican woman, and, at the time of the execution of the deed, ignorant of the English language, unfamiliar with business or her duties as guardian, without knowledge of the boundaries or extent of the grant or of the character and value thereof; that Maxwell represented to Scheurick that the grant was not as large as it was supposed to be; that it did not extend into Colorado or beyond the Red River, whereas it did so extend over 200,000 acres; that Scheurick and the guardian *ad litem* believed and were influenced by said representations; that Maxwell, while generous and magnanimous in many respects, was unscrupulous and tyrannical as well, a resolute and determined man, of large wealth and great influence throughout the county of Taos and Territory of New Mexico; that he made threats that unless the Bent heirs accepted $18,000 for their claims they would never get anything, and that such threats were communicated to the guardian *ad litem*, and that these matters influenced her in making the settlement and conveyance. But it also appears that it was not definitely known at the time where was the boundary line between Colorado and New Mexico; that the guardian *ad litem* acted in concert with the adult plaintiffs who were dealing with their own interests on the same terms, and that she was willing to make the same settlement they did. And when we take into consideration the character, the ability and standing of the husbands of the other adult plaintiffs, the fact that their interests were alike, that they all acted together, that the settlement which was finally made was so nearly that which the father of these minors had proposed in his lifetime, the fact that no fraud, imposition or

error entered into the transaction or brought about the settlement, it is going too far to hold that the mere weakness and ignorance of the guardian *ad litem,* whose interests were looked after by her brother in law and counsel, or the strength and vigor of the opposing party, are sufficient to invalidate a decree otherwise not open to objection.

Again, it is urged that the whole of the consideration had not been paid by Maxwell at the time of the commencement of this suit. The findings are that, as to the payment, the testimony is conflicting. It seems that Maxwell gave notes for the amount to each of the three plaintiffs. The guardian *ad litem* testified that the note she received had been paid — so testifying because her second husband, Thompson, to whom she was married about thirteen months after the death of Alfred Bent, and to whom, at the time of the marriage, she delivered the note with everything else she had, told her it had been paid. Other witnesses testified that only a portion of it had been paid, and the court found that the weight of the evidence was that at the beginning of the suit a considerable sum was still unpaid, but how much could not be ascertained. Maxwell was at all times a man of ample financial responsibility. No part of the proceeds of the note was paid directly to the minors or their mother, but Thompson, her second husband, supported, maintained and educated the minors during their minority with the funds of his wife and himself the same as his own children, keeping no separate account. The sum and substance of all this is, that each of the three separate plaintiffs took notes for the money Maxwell was to pay in settlement. Whether these notes drew interest or not is not disclosed, but Maxwell was a man of large financial ability, from whom the notes could have been collected at any time if the parties desired, and if either of them permitted the note to remain uncollected it must be assumed that it was for some good reason, possibly for the sake of the interest which the note drew. There is no finding that the note to the guardian *ad litem* had not long since been paid, but simply that it had not been fully paid at the time this suit was commenced, to wit, in 1870. If what was paid was not paid to

the guardian *ad litem* it was because she had turned the note, as well as all other papers she had, over to her second husband. Whatever may be said as to the carelessness or the irregularity of these proceedings it cannot be doubted that substantially the proceeds of the note went to the benefit of the children, for they were supported and educated by the second husband the same as his own children. In this connection also it is well to notice the fact that, according to the inventory filed by the widow of Alfred Bent as administratrix, outside of the real estate and the note received from Maxwell, the total assets of the estate were $1408. The claims admitted and allowed in the probate court amounted to $2423; and while certain witnesses familiar with his affairs testified that he had both real and personal property other than that in the inventory, both in New Mexico and Colorado, it does not appear what amount, if any, there was of such property. It would seem from this that the interests of the minors required the settlement of this claim against Maxwell, in order to secure funds for their maintenance and education, for the whole personal estate of their father, as shown by the inventory, was not sufficient to pay the claims allowed.

These are all the matters which are called to our attention as tending to impugn the validity of this consent decree, and even if we were at liberty under the terms of the prior decision to consider all these new matters we are of opinion that there is not enough in them, singly or together, to justify us in disturbing the settlement which was made and the decree which was entered.

In determining the validity of this transaction it must be remembered that the petition filed in the original case brought by Alfred Bent and his sisters disclosed that the interest which their father claimed in the grant arose out of a parol agreement; and so it is not strange that after a decree had been rendered in their favor their counsel advised a settlement and the receipt of money rather than take the chances of further review in an appellate court; that Alfred Bent, the father of these minors, with his sisters, entered upon negotiations looking to a settlement of their claims, and that although there

was a difference of $3000 between what was demanded and what Maxwell offered, they considered the question as settled, and prepared deeds for the purpose of making conveyances of their interests, and that the delay in fully consummating this settlement was owing to the hope of getting a little more money ; that only the accidental death of Alfred Bent prevented the consummation of that settlement, a settlement by adults, and one which would never have afforded any excuse for further litigation, as is shown by the acceptance on the part of the two sisters of the settlement in their favor; that while the guardian *ad litem* was an ignorant and inexperienced woman, her interests were looked after by her brother in law, who was a capable business man, and by counsel learned in the law ; and, while there may have been some irregularities in the proceedings, yet it is affirmatively found that there was no fraud, imposition or error in the transaction or the decree. Surely under those circumstances the decree ought not to be disturbed.

But there is another aspect in which the equities of this case may fairly be considered. The will of Alfred Bent gave the entire estate to his widow — gave it, it is true, for the maintenance of herself and her children, but nevertheless passed the title to her; and though the will had not been probated at the time of this settlement, it was soon thereafter, and, of course, became operative as and from the date of his death, so that at the time of the settlement the title to this property was in her. The owner by his will gave this property to his widow, and by such will trusted to her to make such disposition of it as she should deem best, relying upon her to use the proceeds for her own maintenance and that of her children. He had a right to make such a disposition of the property and entrust it absolutely to her, and that in respect to this property it was not an unwise disposition is evident, for although he must have known of her inexperience in matters of business, he also knew that her interests were identical with those of his sisters, and that their common interests would be cared for by those competent to look after such affairs. If the settlement made by the sisters, as adults,

is beyond challenge, should not that made by the widow, also an adult, be upheld, and for the same reasons? The question, under those circumstances, would be not whether she was guilty of any wrongful use of the funds which she received, but whether she as the holder of the title was fraudulently led into the settlement. It is, of course, not necessary to rest this case upon such suggestions, but they are certainly worthy of consideration in determining its equities.

In conclusion, it may not be inappropriate to call attention to some things which are matters of public history, and which are referred to at some length in the *Maxwell Land Grant Case*, 121 U. S. 325. The Mexican colonization law limited the amount of a grant to a single individual to eleven square leagues, and it was claimed that all grants like this in which outboundaries were named were to be taken as simply grants of eleven square leagues per individual, to be laid off within such outboundaries. As there were in this case two grantees, Beaubien and Miranda, it was according to the claim a grant by the Mexican authorities of only twenty-two square leagues, or $97,424\frac{8}{10}$ acres. While this, with other grants, was on June 21, 1860, confirmed by act of Congress, c. 167, 12 Stat. 71, claim was still made that the confirmation was operative only for the twenty-two square leagues. Some of the Secretaries of the Interior of the United States refused to issue patents in such cases for any more than eleven square leagues per individual grantee, and not until the case of *Tameling* v. *United States Freehold Co.*, 93 U. S. 644, decided in 1876, was it settled that such an act of confirmation was equivalent to a grant *de novo*, and included all the lands within the outboundaries. Indeed, in the opinion in the *Maxwell Land Grant Case, supra*, decided in 1887, it is intimated that the *Tameling case* was not conclusive upon the question, because that was an action in ejectment in which the legal title shown by the patent prevailed, and not until the case then being considered, in which was a direct attack by the United States upon a patent, could it be held that there was a final adjudication of the question. So that while the owners of the land grant were claiming as against the Government the whole

area within the outboundaries it was still an unsettled question whether they would finally succeed in obtaining more than the twenty-two square leagues. Was it not a wise settlement for parties, whose claim to an interest in what might be found to be less than 100,000 acres rested simply on a parol agreement therefor, to obtain for that interest a sum which was more than half what the best government land could be purchased for? We think it can be well said, in the language of the Supreme Court of Mew Mexico, "that the judgment of the court at that time in so considering and accepting said terms was shown to be a fair and reasonable exercise of the chancellor's discretion."

We see no error in this record, and the decree is

*Affirmed.*

Mr. Justice Shiras and Mr. Justice White dissented.