Robert J. SALMERON, individually and as Guardian Ad Litem for Robert J. Salmeron and Melissa Ann Salmeron, Plaintiffs-Appellants,

v.

UNITED STATES of America; G. William Hunter, individually and as United States Attorney for the Nothern District of California, et al., Defendants-Appellees.

No. 83–1596.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 14, 1983.

Decided Dec. 28, 1983.

1358

Herbert F. Kaiser, San Francisco, Cal., for plaintiffs-appellants.

John F. Barg, Chief Asst. U.S. Atty., San Francisco, Cal., for defendants-appellees.

Before WALLACE, SCHROEDER, and FERGUSON, Circuit Judges.

WALLACE, Circuit Judge:

Salmeron filed this action based upon tort and violation of his civil and constitutional rights, claiming that government agents wrongfully deprived him of his children. The district court granted summary judgment, holding that Salmeron's claims were barred by a release he signed in settling an earlier action. Salmeron appealed, and we reverse and remand because we find genuine issues of material fact as to whether the release was voluntarily signed, supported by consideration, and binding on the children.

## I

In reviewing a summary judgment, we must view the evidence and draw inferences in the manner most favorable to the nonmoving party. *Retail Clerks Union Local 648, AFL–CIO v. Hub Pharmacy, Inc.,* 707 F.2d 1030, 1033 (9th Cir.1983). We therefore accept as true the following version of the facts.

In October 1978 Salmeron petitioned the Superior Court of Contra Costa County, California for dissolution of his marriage to his wife, Susan, and for legal custody of their two minor children. Salmeron had been separated from his wife since August 1978 and had physical custody of the children during this entire period. In June 1979, Salmeron's attorney located Susan while she was incarcerated at the Contra Costa County jail and served her with the dissolution Summons and Petition. In a telephone conversation with Salmeron's attorney, Susan was informed that a final hearing for dissolution of the marriage had been set for August 29, 1979.

On August 24, without notice to Salmeron or any court order, United States Marshals physically took Salmeron's children from his mother's residence, where he had been living with them. On the same date, the United States Attorney arranged for the release from jail of Susan and her boyfriend, Jennings. Later that day, Susan called Salmeron and told him that she had the children. On August 29, the state court granted Salmeron's dissolution request and awarded him custody of the children. The court ordered the District Attorney of Contra Costa County to locate and return the children to Salmeron. Three weeks later, Jennings, Susan, and the two children were accepted into the federal Witness Protection Program[1] and relocated outside California in exchange for Jennings's testimony against members of the Hell's Angel Motorcycle Club, a group with which Jennings was apparently associated.

After his children were taken, Salmeron, with his attorney's assistance, vigorously attempted to locate and recover them. He reported the children's abduction to the local police on the day they were taken. Salmeron also asked the Contra Costa District Attorney to institute civil and criminal proceedings against Susan to secure the return of the children. Through the district attorney's assistance, Salmeron's attorney was referred to a United States Treasury

---

1. The Witness Protection Program was created as part of the Organized Crime Control Act of 1970, Pub.L. No. 91–452, §§ 501–04, 84 Stat. 922, 933–34 (reprinted preceding 18 U.S.C. § 3481). It is administered by the United States Marshals Service. *See* 28 C.F.R. § 0.111(c) (1982). Originally, the program was aimed at securing housing facilities to shelter witnesses and their families. Eventually, however, it developed into a means for relocating witnesses and their families and providing them with "new identities and documents to support these new identities." *Witness Security Program: Hearings Before the Permanent Subcomm. on Investigations of the Senate Comm. on Governmental Affairs,* 96th Cong., 2d Sess. 242 (1980) (statement of Howard Safir, Assistant Director for Operations, U.S. Marshals Service, Acting Chief, Witness Security Section) [hereinafter cited as 1980 *Hearings*].

Department agent who supposedly "knew something" about the children. The agent disclaimed any specific knowledge about the children, but further referred the lawyer to a Special Assistant United States Attorney. On October 5, 1979, Salmeron's attorney informed that government attorney of the court order awarding Salmeron legal custody of the children. The government attorney did not admit any knowledge of the children, but agreed to respond with information shortly. She failed to do so.

More than six months later, the same Special Assistant United States Attorney finally revealed to Salmeron's attorney that the children had been relocated under the Witness Protection Program. The government attorney agreed to produce Susan and the children in California for a custody hearing. When Salmeron's attorney tried to arrange the hearing, however, he received a letter saying that the government could not bring Susan to California for the hearing because of the risks and expense involved. Salmeron's subsequent attempts to arrange for a hearing were similarly frustrated.

In January of 1981, the American Civil Liberties Union (ACLU), acting on Salmeron's behalf, filed a habeas corpus action in the United States District Court for the Northern District of California seeking the return of the children. In an ex parte communication with the district court judge, an Assistant United States Attorney disclosed that the children were not located in California. Acting apparently on this information and without any notice to Salmeron's attorney, the district court transferred Salmeron's habeas corpus action to the District Court for the District of Columbia "as the head of the U.S. Marshals Service is located in that jurisdiction." Once the action was transferred, however, the United States Attorney for the District of Columbia moved to dismiss the case for lack of jurisdiction because the Director of the United States Marshals Service was actually located in McLean, Virginia.

While this motion to dismiss was pending, an Assistant United States Attorney for the District of Columbia contacted Salmeron's attorney. The government attorney informed Salmeron's attorney that the children would be returned to Salmeron if he would agree to release the government from any liability for their relocation. Advised by his attorney that he might not otherwise regain custody of the children without extensive litigation and long delay, Salmeron signed the release. The release was also signed by the United States Attorney and two of his assistants. The release was included in an "Order" signed by a district court judge for the District of Columbia. On June 3, 1981, approximately twenty-one months after they were taken from him, the children were returned to Salmeron.

Salmeron subsequently filed the present action against the federal government and various government officials (the government) seeking damages for himself and, as guardian ad litem, for the children based upon claims under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq.*, and for violation of their civil and constitutional rights. The government moved for summary judgment on the ground that the action was barred by the prior release. The district court agreed and granted the motion.

## II

At the outset, the government contends that the district court should not have accepted jurisdiction to entertain a request for relief from the order of another district court. The result of this argument is that the district court did not have jurisdiction to enter the summary judgment. Because the release executed by the parties was included in an order of the United States District Court for the District of Columbia, the government asserts that relief from that order under rule 60(b) of the Federal Rules of Civil Procedure must be sought from the court that issued the order.

We need not reach the issue presented by the government. From careful read-

ing of the document in question,[2] we conclude that relief from the order is not necessary in this action. The preamble to the order recites five agreed "facts." Number four is the alleged release and number five is an agreement to dismiss the habeas corpus action with prejudice upon return of the children. The court order which follows only commands the United States Marshals Service "to assist ... in returning" the children. No one attacks that order. In no part of the ordering language does the district court approve or even comment upon the release. Therefore, there is no need for relief under rule 60(b). The district judge did not err in accepting jurisdiction to hear the motion for summary judgment.

## III

We turn now to the release executed by Salmeron. The validity and interpretation of a release of significant federal rights is governed by federal law. *Jones v. Taber,* 648 F.2d 1201, 1203 (9th Cir.1981).

**2.** The Order states as follows:

This matter having come before the Court on petitioners' petition for a writ of habeas corpus and respondents' motion to dismiss, and the parties having agreed to the following facts:

1. At the time Mikel and Susan Jennings were relocated pursuant to the Federal Witness Protection Program, there was outstanding a California State Court Order granting custody of the two minor children of the marriage of Robert and Susan Salmeron (Robert J.W. and Melissa Salmeron) to Robert Salmeron;

2. The existence of the California State Court Order granting custody of Robert J.W. and Melissa Salmeron to Robert Salmeron was unknown to the United States Marshals Service at the time the children were relocated with Mikel and Susan Jennings;

3. The Memorandum of Understanding entered into between the United States Marshals Service and Mikel and Susan Jennings prohibits the relocation of minor children in violation of court orders.

4. Robert Salmeron agrees that he will never, either individually, or on behalf of or as guardian of Robert J.W. and Melissa Salmeron, institute or prosecute any action or suit, at law or in equity, or in any way aid in the institution or prosecution of any action or suit at law or in equity, against the United States, the United States Mar-

A release of claims for violations of civil and constitutional rights must be voluntary, deliberate and informed. *Id.* Viewing the record in the light most favorable to Salmeron, we conclude that whether Salmeron voluntarily signed the release is a triable issue of fact.

According to the affidavit of Salmeron's attorney, he received a telephone call from a United States Attorney for the District of Columbia in May 1981 offering to return the children. He testified:

The United States Attorney then inquired whether I would be willing to sign the stipulation that Mr. Salmeron, the father, would not sue if the children were returned to his custody. I responded that I would do anything to get the children back immediately. Before saying that I added: "Do you mean that you will not release the children otherwise" or words to that effect. He repeated again, "Well, do you want the children back?"

shals Service or any employees of the Department of Justice on account of or with regard to any matter relating to the relocation of Robert J.W. and Melissa Salmeron with Mikel and Susan Jennings; and Robert Salmeron further agrees to release the United States, the United States Marshals Service and all employees of the Department of Justice from all liability in connection with the relocation of Robert J.W. and Melissa Salmeron with Mikel and Susan Jennings;

5. Upon the return of Robert J.W. and Melissa Salmeron to petitioner Robert Salmeron, Robert Salmeron agrees to dismiss this action with prejudice.

It is, by the court, this 27th day of May, 1981

ORDERED that to resolve the particular factual situation now before the Court, the United States Marshals Service is directed to exercise the broad discretion granted to it in administering the Federal Witness Protection Program to assist Robert Salmeron in returning Robert J.W. and Melissa Salmeron to him. Such assistance by the Marshals Service shall include, if necessary, provision for the safe return of the children to the home of Robert Salmeron, and it is

FURTHER ORDERED that this Order and the accompanying Order shall remain under seal until the children have been returned to Robert Salmeron.

Order of the United States District Court for the District of Columbia, filed May 27, 1981.

Reviewing the record in a light most favorable to Salmeron, an inference may properly be drawn from this conversation that Salmeron's children were being concealed from him as virtual hostages against his signing the release. At the time of this conversation, approximately twenty months had elapsed since the United States Marshals had taken Salmeron's children. For more than a year and a half of that time, the government was aware that Salmeron had a valid state court order awarding him legal custody of the children.

 The district judge relied primarily on Salmeron's representation by counsel in reaching his conclusion that Salmeron signed the release voluntarily. Although legal representation is an important factor in assessing the voluntariness of a release of federal rights, it is not dispositive. Whether such a release was voluntarily executed is a question of fact to be determined from all the circumstances. *See Jones v. Taber,* 648 F.2d 1201, 1203 (9th Cir.1983); *cf. Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 249, 93 S.Ct. 2041, 2047, 2059, 36 L.Ed.2d 854 (1973) (establishing similar test for voluntariness of fourth amendment waiver in a consent search). Salmeron's execution of the release might have been coerced, even though Salmeron's counsel advised him to sign it. Based upon the facts alleged in this case, the district court must look further than the mere fact of legal representation.

At the time the release was signed, Salmeron had already been deprived of his parental rights for nearly two years. His efforts to secure the children's return through both cooperative and adversarial means had effectively been frustrated by the government. The government has characterized Salmeron's execution of the release as the rational settlement of a legal dispute to avoid the litigative risk of an adverse decision. It argues that Salmeron could have chosen instead to litigate the habeas corpus action further. However, Salmeron was faced with the probable dismissal of his action, which had been transferred to the wrong district. In order to regain custody of his children through litigation, it appeared that he would have to refile his action in another court, litigate the merits of his claim, and possibly pursue the matter on appeal. Throughout the course of this litigation, Salmeron would have remained separated from his growing children. The affidavit of Salmeron's attorney states that he advised Salmeron to sign the release "out of desperation in order to recover custody of the children, who belonged with their father all along." On the basis of these circumstances, we find that whether Salmeron voluntarily signed the release is a triable issue of fact.

### IV

 A related issue that may affect the validity of the release involves the consideration given by the government in exchange for Salmeron's execution of the release. Under federal law, a valid release must be supported by consideration. *Maynard v. Durham & S.R. Co.,* 365 U.S. 160, 162–63, 81 S.Ct. 561, 562–3, 5 L.Ed.2d 486 (1961) (release under the FELA); *Paccon, Inc. v. United States,* 185 Ct.Cl. 24, 399 F.2d 162, 172 (1968); *A.R.S., Inc. & National Truck Rental Co., Inc. v. United States,* 157 Ct.Cl. 71 (1962). According to the language of the document, the government gave no consideration. The United States Marshals Service was ordered "to exercise the broad discretion granted to it in administering the Federal Witness Protection Program" to secure the childrens' return to Salmeron.

 But even assuming the document can be interpreted as an agreement by the government to return the children, it is unclear whether this represents consideration for Salmeron's execution of the release. It is elementary law that giving a party something to which he has an absolute right is not consideration to support that party's contractual promise. *E.g., Maynard v. Durham & S.R. Co.,* 365 U.S. at 162, 81 S.Ct. at 562, 5 L.Ed.2d 486. The government's efforts to secure the return of Salmeron's children may therefore not be consideration to support the release as Salmeron had an absolute right to their custody.

On the other hand, forbearance to prosecute a disputed claim is good consideration. 1 *Corbin on Contracts* § 140, at 595 (1963). The government's agreement not to litigate further its obligation to return Salmeron's children might, therefore, provide consideration for his execution of the release. That would only be true, however, if the government had a good faith claim that it did not have to produce the children or disclose their location to Salmeron. Forbearance to prosecute a claim that is known to be invalid is not good consideration. *Id.* at 596.

Serious questions persist about the government's ability to contest Salmeron's habeas corpus action in good faith. The district judge concluded that no evidence was offered showing lack of good faith. We disagree. According to the affidavit of an attorney in the Office of Legal Counsel of the United States Marshals Service, the Marshals Service told Susan to resolve the custody dispute with Salmeron and that it would pay her transportation and legal expenses incurred in responding to the state court custody order. This action suggests that the government recognized the impropriety of using the Witness Protection Program to relocate children in derogation of parental rights. Further evidence of this awareness is found in the "Memorandum of Understanding"[3] which is executed by the Marshals Service and prospective entrants into the Witness Protection Program. One portion of the Memorandum of Understanding states "[c]ourt orders which grant custody of minor children to persons other than a witness who is being relocated, will be honored and said minor children *WILL NOT* be relocated in violation of the court order." Memorandum of Understanding at 7, *reprinted in* 1978 *Hearings, supra* note 3, at 237 (emphasis in original). Indeed, in 1978 a former director of the Marshals Service testified before a Senate subcommittee

that it was the policy of the Service to "work to secure some accommodations so the rights of [a nonrelocated parent] are protected." 1978 *Hearings, supra* note 3, at 123 (testimony of William E. Hall).

The district court did not address directly the question of consideration for the release. In addition to the voluntariness issue, we conclude that this case presents triable issues of fact relating to the consideration given by the government in exchange for the release.

## V

Even if the district court were correct in granting summary judgment against Salmeron, we would reverse as to the children. It has long been established that the court in which a minor's claims are being litigated has a duty to protect the minor's interests. *See, e.g., Thompson v. Maxwell Land Grant and Railway Co.,* 168 U.S. 451, 463, 18 S.Ct. 121, 125, 42 L.Ed. 539 (1897); *United States v. Reilly,* 385 F.2d 225, 228 (10th Cir.1967) ("With the interests of minors at stake, the trial judge had a special obligation to see that they were properly represented, not only by their own representatives but also by the court itself."). Thus, a court must independently investigate and evaluate any compromise or settlement of a minor's claims to assure itself that the minor's interests are protected, *e.g., Glover v. Bradley,* 233 F. 721, 727 (4th Cir.1916), even if the settlement has been recommended or negotiated by the minor's parent or guardian ad litem. *See Thompson v. Maxwell Land Grant and Railway Co.,* 168 U.S. at 463, 18 S.Ct. at 125; *Glover v. Bradley,* 233 F. at 727.

The record before us contains no indication of any judicial inquiry into the interests of Salmeron's children. By its

---

**3.** A copy of this Memorandum is reprinted as Exhibit 29 in *Witness Protection Program: Hearings Before the Subcomm. on Administrative Practice and Procedure of the Senate Judiciary Comm.,* 95th Cong., 2d Sess. 134–36 [appendix 2] (1978) [hereinafter cited as 1978

*Hearings* ]. The procedure by which the Memorandum is presented and explained to prospective entrants into the program is described in 1980 *Hearings, supra* note 1, at 243–44 (testimony of Howard Safir).

own terms,[4] the release purports only to bar future legal actions by Salmeron. On that basis alone, it appears that summary judgment as to the claims of Salmeron's children was inappropriate. To the extent that the release might be viewed as a compromise of the childrens' claims, however, we must also conclude that the release would not bind the children unless it was judicially sanctioned. If the government wishes to pursue this issue on remand, it must demonstrate that the interests of the children were independently considered by an appropriate court and that the "release" of their claims was judicially approved.

## VI

Because we may affirm the district court's action on any ground finding support in the record, *Davis v. United States,* 589 F.2d 446, 448 n. 3 (9th Cir.1979), we address one final contention raised by the government. Throughout this litigation, the government has repeatedly asserted that it is not responsible, as a matter of law, for the ongoing separation of Salmeron from his children. The government correctly asserts that the record does not show that it was aware of the state court order at the time the children were relocated under the Witness Protection Program. It argues that the children were not in the custody of the United States Marshals Service after their relocation, but rather were physically with their mother during the entire period that Salmeron sought their return. The government contends that it was not in a position unilaterally to return the children to Salmeron after it learned of the state court custody order. Because the government had no knowledge of the state court order at the time it "actively" relocated the children, the government apparently believes that as a matter of law it can escape any liability for its "inaction" during the period Salmeron was wrongfully separated from his children after the government learned of the order. We cannot accept this argument.

The rather obvious fact that the children were promptly delivered to Salmeron after he executed the release belies the government's contentions that it was incapable of complying with the state court order awarding custody of the children to Salmeron. *See Franz v. United States,* 707 F.2d 582, 590–91 (D.C.Cir.1983) (finding that the government had sufficient authority to coerce custodial parents in Witness Protection Program into compliance with visitation rights of noncustodial parent). Further, it is unrealistic to argue that Susan is solely responsible for the continued separation of Salmeron from his children after the government learned of the state court order. The government provided Susan and the children with new identities, transported them to another state, and even offered to pay any legal fees Susan might incur in contesting Salmeron's custody of the children. Without this continuing aid, there is considerable doubt that Susan could continue to frustrate Salmeron's attempts to locate and recover the children. *See Franz v. United States,* 707 F.2d at 591–92. For the purposes of our present review, we conclude that the government may not, as a matter of law, avoid any potential liability it may have, by denying responsibility for the continued separation of Salmeron from his children.

## VII

In conclusion, we find that there are genuine issues of material fact regarding the voluntariness of Salmeron's execution of the release, the sufficiency of the consideration given in exchange for the release, and whether the release binds the children. The district court's granting of the government's summary judgment motion was therefore inappropriate. We do not reach the legal issues pertaining to whether a valid claim in tort or for the violation of the constitutional and civil rights of Salmeron and his children has been stated. Nor do we address the issue of what effect, if any, the doctrines of absolute and qualified immunity might

---

**4.** *See supra* note 2, at ¶ 4.

have on the claims against the various government officials in this case. Those questions are better resolved on remand following more extensive development of the facts underlying this litigation.[5]

REVERSED AND REMANDED.

---

**5.** On appeal, Salmeron requested for the first time that this matter be remanded to a different judge, apparently because of some unarticulated perception that the district judge is biased or prejudiced against him. Because Salmeron failed to raise this claim below, and because he fails to specify any facts that would support an allegation of bias, we deny Salmeron's request. *See United States v. Conforte,* 624 F.2d 869 (9th Cir.), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980).