# HAIL et al. v. NASHVILLE TRUST CO. et al.—
## 212 S. W. (2d) 51.

Middle Section.    February 28, 1948.

Petition for Certiorari denied by Supreme Court, June 12, 1948.

40

W. P. Cooper, of Nashville, for adult complainants.

A. T. Adams, of Nashville, guardian ad litem.

William Hume, of Nashville, for Nashville Trust Co.

Norvell & Minick, of Nashville for Fourth & First Nat. Bank and Fourth & First Banks, Inc.

Walker & Hooker and David M. Keeble, all of Nashville, pro sese.

FELTS, J. This suit was brought in 1937 by the widow, children, and grandchildren of Eustice A. Hail, deceased. They were the beneficiaries in six separate spendthrift trusts which he had created for them before his death in 1927. They sued to recover large losses which they charged had been caused by numerous breaches of trust by defendants over a period of several years in the administration of these trusts.

The defendants were the Nashville Trust Company, the trustee in each of these trusts, and two of its officers, Charles Nelson and A. B. Benedict, who had been authorized by the trust instruments to direct sales and reinvestments by the trustee. In their answers defendants denied any liability, explained the numerous transactions, and averred that all of them had been done in strict accord with the terms of the trusts and in the exercise of the utmost good faith.

In 1941 by amended and supplemental bill the Fourth & First National Bank and the Fourth & First Banks, Inc., were brought in as additional defendants. The former was charged with participation in some of the wrongs sued for; and the latter was averred to be the

44

parent, or holding company, owning all the stock of the other two corporate defendants, and to have made a certain written contract by which it had assumed all the liabilities of both its subsidiaries.

After the suit had been pending some ten years and after the complainants had taken a large amount of proof by depositions, the parties reached a compromise settlement of all matters between them. The gist of this settlement was that the Nashville Trust Company and the Fourth & First Banks, Inc., would pay to the clerk and master the sum of $340,000 to be allocated to five of the trusts named, and would take out of them certain stocks which had been alleged to be of little value, speculative, and improper investments for the trusts; that the trustee would pass its accounts, resign, and a new trustee would be appointed; and that all the defendants would be fully discharged and the suit dismissed with prejudice at their cost.

A petition was filed in the cause by all the complainants except three who were minors and who were made defendants to the petition and represented by guardian ad litem. The petition exhibited the writings containing the terms of the settlement, and asked the Chancellor to ratify it and authorize it to be carried into effect by proper decree. The petition also asked him to determine the proper compensation to be paid from the fund to complainants' solicitors, Walker & Hooker (a partnership composed of Mr. Seth M. Walker and Mr. John J. Hooker) and Mr. David M. Keeble, for their services in recovering such fund. For this phase of the case complainants employed other counsel.

After hearing oral testimony for some two weeks, the Chancellor found that the compromise settlement was

for the manifest interest of all the beneficiaries, both those now in being and those that may hereafter be born; and he entered a lengthy decree ratifying all the terms of the settlement, authorizing it to be carried out, setting forth its numerous details, and allocating the remainder of the $340,000, after payment of solicitors' fees and expenses, to the five trusts in certain proportions set out.

He found the reasonable compensation of Messrs. Walker, Hooker, and Keeble to be $95,000, and decreed that they be paid that amount plus $1,852.21, expenses paid or incurred by them, $10,000 to be paid from the Maxwell House trust and the balance from the $340,000 going to the other five trusts. He decreed them a lien on the fund and that the sums to be paid them should bear interest from the date of the decree till payment.

The guardian ad litem prayed a broad appeal from the whole decree. The adult complainants prayed a limited appeal from so much of the decree as fixed the solicitors' fees. The transcript was sent up embracing the large record that had already been made before the compromise agreement and also the bill of exceptions including all the testimony adduced upon the oral hearing. All the appellants have assigned errors, and the solicitors have also assigned an error. So the questions presented are (1) those made by the guardian ad litem upon the whole decree and (2) those made by him and the others upon the part of it relating to the solicitors' fees.

(1) The compromise settlement is very advantageous to all the beneficiaries. It is shown to be so by all the proof without dispute. All the adults are very anxious for it to go through. On behalf of the minors, however, the guardian ad litem raises a number of questions as to

the Chancellor's jurisdiction to enter the decree authorizing the settlement.

■■ None of them, however, goes to the jurisdiction of the subject matter. Nor could such an objection be maintained. Trusts have long been one of the most important heads of inherent equity jurisdiction, and the Chancellor has very broad powers in the administration of trusts. See Henshaw et al. v. Flenniken et al., 183 Tenn. 232, 241, 191 S. W. (2d) 541, 545, 168 A. L. R. 1010, and cases there cited. He had jurisdiction of the subject matter and the parties to this suit. He had power to try the cause and proceed to a proper decree. It is equally true that he had jurisdiction to enter the compromise decree, even though three of the parties were minors represented by guardian ad litem. Boyd v. Robinson, 93 Tenn. 1, 29, 23 S. W. 72; Puckett v. Wynns, 132 Tenn. 513, 178 S. W. 1184; Thompson v. Maxwell Land-Grant & R. Co., 168 U. S. 451, 18 S. Ct. 121, 42 L. Ed. 539.

■ All the beneficiaries were before the court as complainants. They were the widow Lizzie J. Hail, the son Egbert O. Hail and his four children, the daughter Elizabeth Hail Smith and her husband Frank C. Smith and their two children, and the other daughter Avon Hail King and her child. It is true under the terms of the trusts, if other grandchildren should hereafter be born, they should be let in as beneficiaries. But the interests of the complainant grandchildren were such as to give the court jurisdiction to bind the contingent interests of after-born grandchildren. This under the doctrine of virtual representation. Jordan v. Jordan, 145 Tenn. 378, 417, 239 S. W. 423; cf. Barnett v. Daniels, 11 Tenn. App. 443, 450.

It is urged, however, that the trustee was not before the court. It is said that the Nashville Trust Company was sued merely as "Nashville Trust Company," i. e., only in its proper character and not in its representative character as trustee; that as trustee it was not a party to the bill, the amended bill, or the petition; and that it did not enter any appearance as trustee.

While it was not named as "trustee" in the caption of the bill, the averments of the bill stated causes against it in both its capacities—charged it with breaches of trust as trustee and called on it to pay therefor out of its own property. This brought it before the court both individually and as trustee in each of the trusts. Rose v. Third National Bank, 27 Tenn. App. 553, 183 S. W. (2d) 1; Altman v. Third National Bank, Tenn. App., 203 S. W. (2d) 701.

It is insisted that in the earlier part of the decree the Chancellor dismissed the bill and the amended bill, and that this deprived him of jurisdiction of defendants to enter the later parts of the decree. After setting out the settlement, adjudging it to be for the manifest interests of the beneficiaries, fixing the solicitors' fees, allocating the rest of the $340,000 to the five trusts, and ratifying the settlement, the decree stated that the bill and the amended bill "are hereby dismissed." Then followed the rest of its numerous provisions embracing eight more pages.

The argument is that after dismissing the bill and the amended bill the Chancellor had no further power to enter any decree except to adjudge the costs; that such dismissal put defendants out of the case, they not being parties to the petition, and ended the Chancellor's jurisdiction to make any further decree affecting them.

The decree, however, must be read as a whole. It is not to be broken up into its numerous parts and each of its separate provisions treated as successively coming into operation in the order in which they appear in the decree. Each of its parts is conditioned upon all the others and all become operative at one and the same instant. So the provision for dismissal did not put defendants out of the case or deprive the Chancellor of jurisdiction of them to make the rest of the decree. The decree required a number of things to be done. While final in the sense of being appealable, it will become final in the sense of ending the cause only when all the things it requires to be done have been done.

Another like objection is urged against another part of the decree. This part approved the compromise settlement and provided that on paying the $340,000 all the defendants will be fully discharged of all claims, those sued on as well as all others, in connection with all the trusts. It is argued that the court had no jurisdiction to discharge defendants from all breaches of trusts, known and unknown, without first requiring an accounting by the trustee.

But the decree did not do that. The compromise settlement was meant to be a full settlement. Quite naturally, defendants upon paying the large sum of $340,000 expected to be fully discharged of all matters that had been, or ever could be, raised in regard to these trusts. The decree provided for such a discharge but it first required an accounting by the trustee. It "provided that it (the trustee) shall pass its accounts with the Clerk and Master of this Court and such accounts be accepted by him as such. . . ."

The guardian ad litem denies the Chancellor's power to ratify the compromise settlement because it provides

that the stocks are to be taken out of the trusts and transferred to the Fourth & First Banks, Inc., and the Nashville Trust Company. He invokes the rule against self-dealing—the rule that the trustee cannot purchase the trust property from the cestui que trust—and insists that this transfer constitutes a purchase and sale within that rule and is forbidden by it.

He also likens this suit to a proceeding under Code, sections 9227-9243 for a sale of property of persons under disablity, and insists that the transfer is a purchase and sale within sections 8506 and 9243, which prohibit a guardian from purchasing his ward's property at such a sale. Freeman et al. v. Martin, 181 Tenn. 470, 181 S. W. (2d) 745.

We think this transfer, however, is in no proper sense a sale. Certainly it is not a sale to a guardian. Nor is it a sale within the rule against self-dealing—not an out-of-court purchase by the trustee from the beneficiaries. Cf. McNeill v. Dobson-Bainbridge Realty Co., Inc., et al., 184 Tenn. 99, 195 S. W. (2d) 626; Meloy v. Nashville Trust Company, 177 Tenn. 340, 149 S. W. (2d) 73. Upon a proper showing a court of equity may, · on behalf of an infant cestui que trust, confirm a sale of the trust property to the trustee. Davoue v. Fanning, 2 Johns Ch., N. Y., 252, 261; Campbell v. Walker, 5 Ves. 678, 681, 31 Eng. Rep. 801; 2 Scott on Trusts, Sec. 170.7;cf. American Bank & Trust Co. v. Lebanon Bank & Trust Co., 28 Tenn. App. 618, 192 S. W. (2d) 245.

But there is stronger support for the Chancellor's action. This was not a suit to sell property of persons under disability. It was a suit to recover for alleged breaches of trust. Among such breaches were those in connection with this stock. The stock to be transferred

consists of 2,576 shares of preferred and 212 shares of common stock in Ward-Belmont School. A part of this stock was put into the trusts by the settlor. That is, the shares he first put in were later exchanged for shares pursuant to a contract he had made shortly before his death. The rest of the stock was purchased by the trustee some years after his death.

The bill charged that this stock was highly speculative, unsafe, and dangerous, and was an improper investment for the trusts. It was averred that the first part of the stock could have been sold at par and should have been sold by the trustee within a reasonable time after the settlor's death; that it was the trustee's duty, within a reasonable time, to sell this stock and reinvest its proceeds in safe and proper securities. And it was alleged that the trustee's later purchase of the rest of the stock was a breach of duty and a conversion of the trust funds expended for the stock. Thus the retention of part of the stock and the purchase and retention of the rest of it were among the breaches of trust sued for.

For these breaches of trust equity afforded the beneficiaries alternative remedies. One of such remedies was that they could elect to repudiate the trustee's acts, refuse to treat this stock as belonging to the trusts, and look to the trustee for the money for which it should have sold the first part of the stock and for the money expended for the rest of it, with interest. 2 Scott on Trusts, Sections 205-210. But they could not get the money and keep the stock too. Upon payment of the money the trustee would be entitled to the stock. 4 Bogert on Trusts and Trustees, Sec. 946.

They elected to pursue this remedy. If the cause had gone to trial and if the Chancellor had found the issues

in their favor and decreed them this relief, it would have been upon the condition that the Nashville Trust Company (and those liable with it), upon satisfying the decree, should have title to this stock. It cannot be doubted that the Chancellor would have had jurisdiction to decree such relief. It is equally certain that he had authority to ratify the compromise, which effected the same result.

This disposes of all the objections urged against the decree as a whole, and brings us to the questions made upon the part of it relating to the solicitors' fees.

(2) The adult complainants and the guardian ad litem insist that the amount allowed for the solicitors' fees was too much. The solicitors submit that, while they do not wish to be in the attitude of complaining, the amount allowed was less than what the undisputed proof showed would have been proper for the services rendered and the results accomplished.

In their discussions of this question, able counsel have filed large briefs and made full oral arguments at the hearing. But, as we understand, there is no dispute among them as to the applicable legal principles. In determining what is reasonable compensation for legal services, each case must, of course, depend upon its own peculiar facts. The same principles apply in the case of minors as in the case of adults. Bowling v. Scales, 1 Tenn. Ch. (Cooper's) 618.

The circumstances to be considered in determining the compensation of an attorney are the amount and character of the services rendered; the labor, time, and trouble involved; the character and importance of the litigation; the amount of money or value of the property involved; the professional skill and experience

called for; whether the fee is absolute or contingent, it being recognized that the fee should be greater where it is contingent; and the results accomplished. Eakin v. Peeples Hotel Co. Tenn. Ch. App., 54 S. W. 87, 89 (opinion by Neil, later Chief Justice of our Supreme Court); Roberts v. Vaughn, 142 Tenn. 361, 219 S. W. 1034, 9 A. L. R. 1528.

It is undisputed that the fees of the solicitors in this case were contingent. When the beneficiaries employed Mr. Walker's firm in November, 1933, they had ceased to receive any income from the trusts, and it was believed that the trust properties were of comparatively small value. It was stated that the beneficiaries had no money to pay a fee or even the expenses of the necessary investigations; that the fee would have to be contingent upon anything that might be recovered; and that the solicitors themselves would have to advance the expenses. They did advance $1,852.21 for expenses, no part of which has been repaid.

And there is little or no dispute of fact as to the amount and character of the services rendered. They are reflected in the large record that had been made before the compromise was agreed to; and they are succinctly stated by Mr. Walker in a written statement which embraces some thirty-five single-space typewritten pages. They are likewise set out in the testimony of Mr. Walker and Mr. Keeble. No question is made upon the accuracy of this statement or this testimony.

It would not be possible, within the allowable limits of a judicial opinion, to detail the mass of circumstances showing the numerous and complicated questions of law and fact involved, and the extent and character of the services rendered by the solicitors in this cause. We can

only give such an outline of them as to indicate their extent, character, and value.

After the solicitors were employed in November, 1933 Mr. Walker employed an auditor and got permission from Mr. Nelson for the auditor to make an audit of the trustee's books and records. This auditor, working at various times, spent two or three years in this work. He died before his deposition was taken. Mr. Walker employed another auditor who worked for a long time checking books and records of the trustee. In all some fifteen different audit reports were made embracing more than 450 pages; and there were photostats made of some 175 of the trustee's ledger sheets of the seven or eight different accounts being investigated.

Eustice A. Hail had left six different trusts. In 1924 he set up four of these trusts, one for his wife, one for his son, and one for each of his two daughters. At his death on April 20, 1927, each of these trusts contained 150 shares of Ward-Belmont preferred stock, 100 shares of Bransford Realty Company preferred stock, 188 shares of Horseshoe Lumber Company preferred stock, and 25 shares of Horseshoe Lumber Company common stock.

About a year before his death he set up what is called in the record the E. O. Hail et al. (insurance) Trust. This trust was for the benefit of his widow and his three children and it contained 15 insurance policies on his life aggregating $150,000. It also contained 350 shares of Ward-Belmont common stock, 25 shares of stock in the University Realty Company of Houston, Texas, and 100 shares of the common stock of the Ridley Phosphate Corporation. The trustee was to use the income from these stocks to keep the life insurance premiums paid.

The other and sixth trust was what is called the Maxwell House Trust. It embraced 508 shares of the common stock in the Maxwell House Company. That company had issued and outstanding 1,000 shares of common stock, each share the par value of $100. This trust was for the benefit of the widow and each of the three children. Upon the death of the widow her one-fourth share became part of the trust for the three children. Upon the death of each child his share went to his children living at that time.

Generally speaking, the provisions of all of the six trusts were very much alike. The beneficiaries could not anticipate the income, which was to be paid to the widow and each of the three children for life. The trustee was given power to encroach on the corpus to take care of their emergencies or to maintain them in their accustomed standard of living. At the death of each life beneficiary his share was to be held for the benefit of his children living at the time, and as each of such children reached the age of twenty-one his share was to be paid to him free of the trusts.

The insurance trust contained this provision: ". . . the Trustee may sell all or any part of the property constituting the corpus of the same, and shall reinvest the proceeds of sale in such manner as it in its judgment may deem best, without regard to any restrictions then placed by the laws of the State of Tennessee upon investment of trust funds; provided, however, that during the lives of Leslie Cheek, A. B. Benedict, and Charles Nelson, all of Nashville, Tennessee, or during the lives of any surviving two of them, such sales and reinvestments shall be made when and in the manner and upon such terms as any two of them shall direct in writing; and, during

the life of the survivor of all of them, the same shall be made when and in the manner and upon such terms as he shall direct in writing." Tr. p. 78.

All the other trusts contain a somewhat similar provision. The trustee was empowered to sell and reinvest provided such sales and reinvestments were made when and in the manner and upon such terms as Cheek, Benedict, and Nelson, or any two of them, should direct in writing. It appears the Cheek was out of the United States most of the time till he died, and that he did not act under this provision. But the other two did, and Mr. Nelson had a bound book showing that all the sales and reinvestments of the trustee had been made as directed by them in writing. Also he had a letter from all the adult beneficiaries asking the trustee to invest "the uninvested corpus in our various trusts in Ward-Belmont School preferred stock". Tr. 119.

Besides the $150,000 of insurance put into the insurance trust, the settlor had some $85,000 of other insurance on his life. He made a will of the rest of his property giving one-half to his wife and the other half to his three children. He appointed them as executors. After his death in April, 1927, it was found that his estate was very much involved. He had formerly been connected with the Nashville Trust Company himself and was friendly to Messrs. Nelson and Benedict. His widow and children were non-residents of Tennessee and did not qualify as executors. Instead, they acceded to the wishes of the officers of the Nashville Trust Company and allowed it to qualify as administrator C. T. A. of the Hail estate. They also turned over to it the $85,000 of insurance money to enable it better to administer the estate and protect the trusts.

The estate was indebted to the Nashville Trust Company as a bank by eight notes totaling $295,000, to the Fourth & First National Bank by seven notes totaling $143,441.73, to the Central National Bank by six notes totaling $39,100, and to J. P. Dunlop of Clarksville by three notes totaling $50,836.10. The estate was also indebted to numerous other banks. According to the inventory filed by the Nashville Trust Company as administrator C. T. A. his estate was insolvent, the assets listed being valued at $1,012,287.19 and the liabilities then known amounting to $1,015,774.08.

It was doubtless a great mistake for the Nashville Trust Company to undertake to act in its several capacities: six trustees in as many different trusts, administrator C. T. A., and also a very large creditor. Its difficulties were later further enhanced by its becoming an affiliate of the Central National Bank and the Fourth & First National Bank under the parent holding company, the Fourth & First Banks, Inc. It doubtless undertook these multitudinous and inconsistent duties by reason of a desire on the part of its officers to try to work out the difficulties in settling the Hail estate and protecting the beneficiaries of the trusts. None of these trust instruments had been recorded at the time of the settlor's death, and all of them were therefore in danger of attack by his numerous creditors.

The difficulties were further enhanced by the worldwide depression that occurred between 1929 and 1933 which caused a great shrinkage in security values and great losses to investment trusts all over the country. As stated, when Mr. Walker's firm was employed in the latter part of 1933 the Fourth & First National Bank had failed as well as numerous other banks in the coun-

try. The payment of income on the trusts had ceased and it was believed that the trust properties were of comparatively small value.

The first work of the solicitors for complainants was that of going over great numbers of transactions with the auditors, studying the many audit reports, investigating the numerous transactions both in the administration of the estate and in the management of all six of the trusts. The estate and the trusts held stock in a large number of corporations in Nashville and elsewhere. All these matters had to be investigated by the solicitors.

This work consumed a large part of the time of solicitors during the two or three years before the filing of the bill. The bill was filed February 9, 1937, against the Nashville Trust Company, Charles Nelson, and A. B. Benedict. Though obviously drawn with great care to abbreviate it, it, with its exhibits, embraced more than 90 typewritten pages. We state some of the breaches of trust it charged.

The trustee used $50,586.15 of the funds of the insurance trust in the purchase of three notes totaling that amount owing by the Hail estate to J. P. Dunlop. These notes had attached to them 375 shares of the Dunlop Milling Company stock, for which the notes had been given. The Dunlop Milling Company failed and this investment was a total loss. It was charged that these notes and this stock were an improper investment by the trustee.

The trustee with the funds of the insurance trust purchased from the Broadway National Bank a note of E. A. Hail in the sum of $17,500 and two notes signed by Mrs. Lizzie J. Hail, which were alleged to be the obligations of her husband, one for $12,500 and one for

$13,750. With these funds it also purchased from itself as administrator C. T. A. a note signed by her in the sum of $18,000. This note was also alleged to be her husband's obligation. There was collateral on some of these notes but these purchases resulted in a net loss of some $12,000 to the trusts.

The Nashville Trust Company as administrator C. T. A. paid notes of the Hail estate to the Fourth & First National Bank totaling $109,000, overdrawing its administrator's account some $97,000. In the transaction it came into possession of Orndorf Hotel bonds in the face amount of $25,000. It sold these bonds to the insurance trust for that amount. This caused a loss of more than $20,000 to the trust. It was charged that these were not proper investments and that the trustee, being an affiliate of the bank, violated its duty of loyalty.

The administrator carried this overdraft for quite a while. As administrator it sold to itself as trustee 926 shares of preferred stock in Ward-Belmont School—231 shares for each of the four individual trusts and two shares for the insurance trust. It sold itself this stock at par or $100 per share. It used part of this money to pay off the overdraft and about $67,000 of it to pay debts of the Hail estate to itself and its affiliate the Central National Bank.

In this connection, the trustee had kept and retained in the trusts 1,650 shares of the Ward-Belmont stock. These transactions as to this stock were charged as breaches of trust. The trustee had also retained 400 shares of Bransford Realty Company preferred stock. It was charged that this stock could have been sold for $70 per share, that it was speculative and improper, and that its retention had caused a loss to the trust in the

amount of $20,000. Another breach of trust was charged to the trustee for its failure to collect a note of Mr. Benedict in the sum of $16,333. It was also charged that the trustee had paid itself compensation in the amount of $6,729.34; and that it was not entitled to this compensation because of its numerous violations of its duty.

The defendants filed an answer embracing some 50 pages. They vigorously denied any liability and undertook to explain all of the transactions in detail. They averred that every transaction had been conducted in strict accordance with the terms of the trusts, in the utmost good faith, and in a sincere effort to pay off the debts of the Hail estate and to protect the properties in all the trusts.

They also averred that the trustee was a mere depository or custodian without authority to sell or reinvest except by written direction of the three advisers named in the trust instruments; and that every sale and investment had been carried out by such directions of Messrs. Nelson and Benedict, who had in every instance exercised good faith and their best skill and judgment to protect the trusts. They further stated that many of the transactions complained of had been approved beforehand by all the adult beneficiaries, and cited the instance of the purchase of the Ward-Belmont stock.

On October 4, 1941, the complainants filed an amended and supplemental bill bringing in as additional defendants the Fourth & First National Bank and the Fourth & First Banks, Inc. The amended and supplemental bill charged that the Fourth & First National Bank had participated with the trustee in a number of the breaches of trust. It also averred that the Fourth & First Banks, Inc. had signed a written agreement by which it had assumed

all the liabilities of both of its subsidiaries. These two additional defendants filed demurrers and answers in which they denied liability.

From time to time the complainants took their proof and had taken a large amount at the time the compromise settlement was agreed to. In August, 1944, they withdrew the averments of the bill charging breaches of trust in respect to the Maxwell House trust.

Solicitors performed a great deal of service in connection with the Maxwell House trust, first in regard to a lease on the property and later with reference to a sale which Mr. Walker negotiated for the stock. He was finally able to sell it at $305 per share, which was about twice the price received by other common stockholders who sold their stock. For the 508 (plus 50 other) shares he received $170,190, which was placed in the Maxwell House trust in lieu of the stock, and by the Chancellor's decree is to be paid by the trustee to the clerk and master in this cause.

In December, 1944, the solicitors brought suit for complainants against the Nashville Trust Company to recover the eighty-odd thousand dollars insurance money which they had advanced to it. There was a recovery for them and solicitors received a fee of $10,000 in that suit. That suit, however, was a separate one in itself, and was no part of the trust litigation here involved.

The foregoing is only a very brief outline of the services rendered by the solicitors in this cause up to the time the compromise settlement was reached. But it serves to show that such services were long, difficult, and arduous. They took a great part of the time of the solicitors for some eleven or twelve years. The questions of

fact were numerous and complicated. The questions of law were equally unsettled, uncertain, and difficult.

At the time of solicitors' employment and at the time of the filing of the original bill the law in this State governing the duties of fiduciaries in investment trusts, especially in respect to the questions involved in this cause, had not then been settled. It was later settled along the lines forecast in this suit by a series of reported decisions: Thruston v. Nashville & American Trust Co. et al., D. C. 1940, 32 F. Supp. 929; Cowan v. Hamilton National Bank, 1941, 177 Tenn. 94, 146 S. W. (2d) 359; Meloy v. Nashville Trust Co., 1941, 177 Tenn. 340, 149 S. W. (2d) 73; Knox County v. Fourth & First National Bank et al., 1944, 181 Tenn. 569, 182 S. W. (2d) 980.

At the time this suit was undertaken and while most of the work was being done solicitors for complainants were confronted with uncertainties, difficulties, and questions which required not only unusual labor but legal skill and ability of the highest order. Solicitors on both sides were among the most able and eminent in our State; and the contest promised to be vigorous and the outcome doubtful. It was not until after these decisions that the outlook turned in favor of complainants.

It is not disputed that the compromise settlement is very advantageous to all the beneficiaries. Mr. Smith, one of the complainants, said that. So did his present counsel. Mr. Berry, senior member of the firm of Bass, Berry & Sims, said it was "very advantageous." Mr. Trabue, formerly a member of Trabue, Hume & Armistead, who represented the Nashville Trust Company, said it was a "splendid settlement." Mr. Hume described it as an "enormous" settlement.

In the latter part of 1933 when the solicitors were employed the assets of these six trusts were of small value. They now appear to be worth approximately $650,000, counting the $170,190 for which solicitors were able to sell the Maxwell House stock and the $340,000 to be paid into the trusts under the compromise settlement. And the addition of these two large sums does not fully reflect all the services counsel rendered during the eleven or twelve years since their employment.

On the oral hearing before the Chancellor a number of prominent members of the Nashville Bar testified that they had read Mr. Walker's statement, and expressed the opinion that solicitors were entitled to at least $10,000 for their services in the Maxwell House trust and an additional one-third of the recovery under the compromise settlement. These members were Judge E. F. Langford, Mr. Charles C. Trabue, Jr., Mr. Frank Berry, Mr. William Hume, Mr. Charles L. Cornelius, Mr. Ferris Bailey, Judge Albert Williams, and Mr. J. Mac Peebles, past president of the Tennessee Bar Association. There was no evidence offered to the contrary.

These opinions, while not binding on the Chancellor or on this Court, are entitled to be given great weight. Eakin v. Peoples Hotel Co., Tenn. Ch. App., 54 S. W. 87; State v. Delinquent Taxpayers, 26 Tenn. App. 62, 167 S. W. (2d) 690.

Upon full consideration of this large record and all the oral evidence, we think the amounts allowed solicitors were only fair and reasonable compensation for the services rendered by them and the results they accomplished. The $10,000 for the services in the Maxwell House trust, we think, was very reasonable; and the $85,000 allowed out of the $340,000 compromise settle-

ment is well within the prevailing rule for one-third of the recovery where the fee is contingent. Roberts v. Vaughn, 142 Tenn. 361, 219 S. W. 1034, 9 A. L. R. 1528.

Appellants make two different insistences as to the amount of the recovery. One of these is that the recovery is only $150,000. The other is that the recovery is a little more than $260,000. The first insistence is based upon the first offer that was made to compromise the suit. That offer was made by Mr. Howell H. Campbell, the officer in charge of liquidating the Fourth & First Banks, Inc. It did not contemplate surrender of the stock, but proposed to pay $150,000 in full settlement.

In their effort to show that the $150,000 first offered represents the net recovery after deducting the value of this stock, complainants called Mr. Campbell as a witness. He completely negatived this insistence and showed that his offer was made in February or March, 1946, and that it was promptly declined and the negotiations were broken off.

Several months later new negotiations were begun by the attorneys representing the Nashville Trust Company and the Fourth & First Banks, Inc. These negotiations finally resulted in the compromise offer by the trustee and its parent to keep the stock and pay $340,000 in full settlement.

While this offer was being considered Mr. Smith, one of the complainants and the spokesman for the others, came to Nashville and the value of this stock was considered and discussed by him and the solicitors. Dr. Blanton had put some of the Ward-Belmont School stock in two trusts for his widow and his daughter Mrs. Townsend. Those trusts were to terminate when that stock was sold. Through a wash sale the trusts were terminat-

ed and the stock transferred to the name of Mr. Townsend. The solicitors suggested to Mr. Smith that he get in touch with Mr. Townsend and see if the 2,576 shares could be sold to him. Mr. Smith next day reported to them that Mr. Townsend was out of the picture. Thereupon the compromise offer was accepted that day, September 11, 1946, and the writings embodying it were signed.

Appellants' second insistence rests upon an alleged offer by Townsend to purchase this stock at $30 per share. During the oral hearing, and while Mr. Walker was being cross examined by the present counsel of complainants, a letter was produced purporting to be an offer by Townsend of $30 per share for the stock. This letter had just been sent to counsel by Townsend, apparently at the request of Frank C. Smith for use at the hearing. When it was produced Mr. Walker thought it was not an offer in good faith and so expressed himself.

He then stated to the court that the proposed compromise settlement should be torn up, and the stock sold to Mr. Townsend. He also stated that if Mr. Townsend would pay the money into court, he would ask the court not to approve the settlement but to disregard it, let the stock be sold to Townsend, and let the litigation proceed.

Mr. Norvell, the counsel representing the Fourth & First Banks, Inc. was not present; but Mr. Hume, counsel for the Nashville Trust Company, stated to the court that he agreed that the compromise offer should be disregarded and that the stock should be sold to Mr. Townsend, if the latter would pay $30 per share for it. In the course of this colloquy counsel for complainant said: "Mr. Cooper: I am caught in this position. One horn of the dilemma, my clients want this settlement to go

through. At the same time, my clients have employed me to try to reduce the amount of this attorney's fee, for one purpose, it reflects on your Honor's mind, and the other purpose is to show the value of this stock; but irrespective of its value, the clients I represent want this settlement to go through." Tr. p. 141.

Mr. Townsend did not pay the money into court; nor did he come to back up the offer in any way. Nothing further was heard from it. In view of these circumstances we are not convinced that it was a bona fide offer.

A large amount of evidence was introduced in regard to the value of this stock. There was no market value for it. Every known sale of it was put into evidence. These few sales ranged from 10 cents to $5 per share. In two instances some of the stock was taken in on some of Mr. Benedict's obligations at $15 per share. Without discussing this evidence in detail we find as a fact that the reasonable value of the stock at the time of the settlement agreement was between $10 and $15 per share.

Upon this basis the total value of the 2,576 shares of preferred stock to be surrendered would be between $25,760 and $38,640. The common stock does not appear to have been worth anything. This would leave the net recovery between $314,240 and $301,460. So the $85,000 fee to be paid out of this would be only 27 or 28 per cent of the recovery.

Appellants insist that the Chancellor should not have declared a lien on the recovery to secure the payment of the solicitors' fees. All the trust property is in custody of the court. It is to be paid to the clerk and master, who is directed to pay the solicitors' fees allowed. It was proper for the Chancellor to declare the lien on

the fund. Code, sections 8335, 8336; Roberts v. Vaughn, 142 Tenn. 361, 370, 219 S. W. 1034, 9 A. L. R. 1528.

Appellants also complain of the action of the Chancellor in allowing interest from the date of the decree on the sums directed to be paid to the solicitors. By statute judgments and decrees for money bear interest from their date. Code, section 7308. The decree was in effect a decree for payment of money. It directed the clerk and master from the funds to pay the sums to the solicitors. So we think it was not error to allow these sums to bear interest from the date of the entry of the decree until they are paid.

All of the assignments of error are overruled. The decree of the Chancellor is in all things affirmed. The cause will be remanded to the chancery court for further proceedings not inconsistent with this opinion. The costs of the cause are adjudged against appellants and the sureties on their appeal bond. After they have paid such costs here they shall be reimbursed therefor on the remand out of the corpus in each of the six trusts in such proportions as the Chancellor shall direct.

Howell and Hickerson, JJ., concur.