**Robert Hugh JONES, Plaintiff-Appellant,**

v.

**Rodger TABER, Robert David, Felix Humbird, Stuart Kilby, Irv Burkett, Stan Cargill, Stanley Kerner, William Gatske, and Sam Van Meter, Defendants-Appellees.**

No. 78–2310.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 2, 1980.

Decided June 22, 1981.

Ron D. Ferguson, Tualatin, Or., for plaintiff-appellant.

Jack D. Hoffman, Portland, Or., for defendants-appellees.

Before KENNEDY and SCHROEDER, Circuit Judges, and McNICHOLS,* District Judge.

KENNEDY, Circuit Judge:

Appellant Jones filed a civil rights action against officials of Multnomah County, Oregon. The district court granted summary judgment for the defendants on the grounds that Jones had, in exchange for $500 paid to him, signed a release in favor of all the defendants. We find that sum-

mary judgment was inappropriate and reverse.

The facts are not disputed in any material respect by the appellees. Jones was being held in county jail after conviction and while awaiting sentence. On the night of July 3, 1976, Jones was taken from his cell, stripped, gagged, bound, chained to a wall, hosed with cold water and beaten with a night stick. The incident lasted 3 to 5 hours. He was then replaced in a special segregation facility and held there for nineteen days until, on July 22, he was escorted without notice to an interview room to meet with a deputy county counsel and a claims adjuster. The subject of the meeting was whether or not Jones would accept $500 for a release in favor of the county and the individual defendants for all claims arising from the beating and mistreatment on the night of July 3.

At the conclusion of the meeting Jones accepted the release and executed the documents presented to him. A transcribed tape recording covering part of the interview is in the record below and on appeal. A transcript of the interview discloses that representatives of the county did not advise Jones that the county was liable for its conduct or that he had a federal claim. The adjuster did ask Jones whether he had retained an attorney for the July 3 incident or if he wanted one, and Jones responded, "Not really. It all depends on how things turn out."

In the district court, the threshold issue in this civil rights suit was, of course, the validity of the release. To support their summary judgment motion, the defendants took Jones' deposition. It, too, was part of the record considered by the trial court. At the deposition Jones testified that he had signed the release "voluntarily," that he had realized that there "might have been a violation" of his rights, but that he had signed the release "for the money," and that it had crossed his mind that settlement

* Honorable Ray McNichols, United States District Judge for the District of Idaho, sitting by designation.

might be better than taking his chances at trial. When asked at the deposition why he had not requested to talk with an attorney, he responded, "I didn't think I really needed one." Based on these admissions and on the transcript of the interview at the time of settlement, the trial court granted summary judgment for the defendants, holding that the release was a complete bar to recovery.

We turn to the principles that should control our examination of whether or not the release in the instant case is valid. Counsel for Jones hesitantly suggested to us that federal law might have a bearing on the case, and then proceeded to an extensive analysis of Oregon law. The conditions affecting the validity of a release of significant federal rights are eminently a matter of federal law, and we find it unnecessary to examine Oregon authorities. *See Boyd v. Adams*, 513 F.2d 83, 87 (7th Cir. 1975) (§ 1983 waiver void as a matter of law and against public policy; no analysis of when release might be valid).[1]

A release of claims under section 1983 is valid only if it results from a decision that is voluntary, deliberate, and informed. *See id.* at 87–88. *Cf. McCarthy v. Cahill*, 249 F.Supp. 194 (D.D.C.1966) (release of personal injury claims set aside for fraud). There are both subjective and objective aspects to each of these elements. *See Boyd, supra*, 513 F.2d at 88. *Cf. Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) (discussion of objective factors relevant to voluntariness).

Although we do not find cases which analyze the necessary criteria of validity for a section 1983 release, we find adequate and instructive guidance from decisions interpreting maritime releases. "A party who attempts to rely on a maritime release has the burden of proving its validity." *Charpentier v. Fluor Ocean Servs., Inc.*, 534 F.2d 71, 72 (5th Cir. 1976). *See generally Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 246–49, 63 S.Ct. 246, 251–52, 87 L.Ed. 239 (1942). Of course, the burden is always on the party advancing an affirmative defense to establish its validity. The special significance of maritime release cases is that a release's validity must be predicated on an unusually strong showing that the nature and extent of the seaman's injuries and the shipowner's potential liability for them was explained clearly to the seaman in circumstances where his signing of the release was quite free and intelligent. In maritime cases, a seaman's release of claims for injuries cannot be relied on by a shipowner otherwise liable for the injury unless the shipowner can affirmatively demonstrate that the claimant understood the nature of whatever statutory and common-law remedies he waived by the release. *See Charpentier v. Fluor Ocean Servs., Inc.*, 613 F.2d 81, 84 (5th Cir. 1980) (after remand). *See also Strange v. Gulf & South American Steamship Co.*, 495 F.2d 1235 (5th Cir. 1974); *Blanco v. Moran Shipping Co.*, 483 F.2d 63 (5th Cir. 1973). The federal solicitude for claimants under section 1983

---

1. Title 42 U.S.C. § 1988 (1976) indicates that in some cases state law may supply the rule of decision in section 1983 cases. This is only true, however, when the state rule would not conflict with the federal interests served by section 1983. *See Board of Regents v. Tomanio*, 446 U.S. 478, 486–92, 100 S.Ct. 1790, 1796–99, 64 L.Ed.2d 440 (1980) (state statute of limitations and tolling rule apply in § 1983 action); *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). To apply state law to resolve a more substantive question, such as waiver, is far more likely to conflict with federal policies of deterrence and compensation served by the Civil Rights Act. *Tomanio*, 446 U.S. at 488, 100 S.Ct. at 1797.

In considering the appropriate relation between state and federal law specifically with regard to a release of claims, it would be truly paradoxical if a claim against a state for physical abuse could be extinguished by the fact that the abuse culminated in a waiver of the claim in question. Although a right to relief under section 1983 may be waived by a very sophisticated plaintiff's continued rejection, for more than a year, of the defendant's partial offer to grant what plaintiff alleges he was deprived of, that proposition does not avail the defendants on the dramatically different facts of this case. *See Suckle v. Madison General Hosp.*, 362 F.Supp. 1196 (W.D.Wis.1973), *aff'd*, 499 F.2d 1364 (7th Cir. 1974).

is at least as great as that for seamen and in both situations the claimant's dependence on potential defendants requires the release to be examined with particular care. Because the indicia of reliability required of section 1983 releases must be no less unambiguous than those required of maritime releases, we hold that defendants relying on section 1983 releases signed by prisoners must meet the same standard of validity applicable to maritime releases.

■ In the context of section 1983 waivers, several factors are relevant: although both parties may agree on certain facts, including the accuracy of the transcript of the claimed settlement conference, summary judgment is precluded when conflicting inferences might be drawn about a party's state of mind as reflected by objective indications. *See, e. g., Higgins v. Fuessenich*, 452 F.Supp. 1331 (D.Conn.1978). Jones' state of mind, that is to say the subjective aspect of the case, is a significant factor that must be considered on remand of the case to the finder of fact. That Jones admitted in his deposition that his signature on the release was "voluntary" is not by itself controlling in this regard, absent a showing that he understood the meaning of the term in its legal sense. On the record before us his statement amounts to little more than a legal conclusion on a question as to which he was not well informed.

■ There are, moreover, objective indications of coercive pressures and a lack of understanding [2] here that preclude granting summary judgment for defendants.

One objective factor that must be considered on remand is the presence of a noncoercive atmosphere for the execution of the release, or how significant is the absence of such an atmosphere. *See Boyd,*

2. The transcripts of the meeting on July 22, 1976, after which the release was signed and of the deposition on February 2, 1977, the accuracy of which is not disputed, contain evidence that is ambiguous on the question whether Jones' waiver was knowing and voluntary.

The relevant background is as follows. The beating took place on July 3, or the early morning of July 4, 1976. Jones was scheduled to be sentenced on July 21, 1976, when he met briefly with his lawyer, but sentencing was postponed for some reason. He was actually sentenced sometime between July 22, 1976, when the release in question was signed, and February 2, 1977, when his deposition was taken.

At some points in his deposition Jones' answers suggest the release was valid. He said the people at the July 22 meeting were friendly and did not press him, pp. 19, 31 [page citations throughout are to the deposition], that he signed the release "for the money," p. 36, and that he was able to talk to his lawyer the day before he signed the release.

Others of Jones' answers were ambiguous. He thought that signing the release meant he would not press assault charges, but also said he understood the release also covered civil claims, although there is little indication that he knew what this meant in the circumstances at issue. Pp. 30–31. Jones' opinion about the fairness of the settlement varied from the statement that he "didn't think it was really fair" to "[it was] fair for the amount of time it was." P. 31. He replied affirmatively to general questions about whether he knew what was going on but also claimed that he felt he had no time to think the matter over. Pp. 23, 40. His explanation for having signed the release was that it was better than taking his chances in a lawsuit but also that it might avoid further trouble with the authorities. Pp. 81–82. He gave confused answers to questions asking whether he understood his claim was like that arising out of an automobile accident. Pp. 77–78, 85.

At many points in his deposition Jones' answers put the indications given above into a context that raises doubts about the validity of the release inasmuch as the answers might suggest a basic lack of understanding or a sense of at least indirect coercion due to the general conditions of his confinement or relating more specifically in appellant's mind to his signing of the release.

Jones' understanding of the release may well have been impeded by his isolation. Efforts to reach his lawyer were obstructed by prison officials. Pp. 32–33, 35, 63. He was able to talk to his lawyer only briefly on the day before his (later postponed) sentencing hearing; the possible 20-year sentence understandably overshadowed other subjects. Pp. 47–48. His efforts to talk to any others about his problem before signing the release were also frustrated. Pp. 25, 34–35. Tank B, in which he was kept, allowed virtually no conversation between inmates. Pp. 41–45. The record is replete with specific examples of Jones' lack of understanding, *see* pp. 30–31, 77–78, 85; most striking is his testimony that he thought the guards were within their legal prerogatives in abusing him as they did, but that he thought they wanted to give him money because they felt bad about it, *see* pp. 35, 49, 59, 63.

*supra,* 513 F.2d at 88. Immediately after the beating and mistreatment were sustained by Jones, he was put back into a special segregation facility.[3] The circumstances of the original injury may thus be tied in a direct and proximate way to the release in that they may have been inherently coercive.[4] Objective factors that might dissipate this coercive atmosphere, such as the presence of an attorney representing the releasing party or the opportunity for Jones to consider the consequences of his actions in a neutral environment, appear to have been absent.[5] We do not foreclose a finding of a voluntary release when the release is entered into by a prisoner without presence or assistance of counsel, but these circumstances must be weighed carefully.

The statements by the attorney and the adjuster representing the county may not have served to dispel these inherently coercive pressures. The transcript shows only a minimal attempt to explain to Jones the nature or extent of the rights he was waiving. The following excerpt is representative:

Ross [claims adjuster]: Well, Multnomah County isn't necessarily in trouble at all. They are investigating the thing with regard to their internal investigation, any kind of incident that occurs like this and there are a lot of incidents that they investigate. But just the fact that they investigate it doesn't mean that they are necessarily liable. What I'm saying is that I think Multnomah County has some

exposure and rather than going to all of the hassle of furthering the investigation, defending the matter in court and going through all of that sort of thing . . . .

Record at 27. Defendants must demonstrate that the meeting gave Jones a clear and sensible idea of the existence of a very significant federal remedy for the abuse of prisoners by state officials. The following exchange is pertinent in this regard:

Jones: No, I don't have any questions about it myself. I didn't think anything would happen about it. I thought they had the right to do it all really.

Ross: You thought that the officers had the right to do it?

Jones: Yeah. It seemed like they like you know—they kept always threatening to do stuff like that to the rest of the men they did it so I figured maybe they had a right cause we were in jail.

Ross: I see—well that's like I say, we have an exposure I think . . . .

Record at 27–28. *Cf. Schneckloth v. Bustamonte,* 412 U.S. at 249, 93 S.Ct. at 2059 (knowledge of right to refuse a factor in determining voluntariness of consent to search); *Apitsch v. Patapsco & Back Rivers R. R.,* 385 F.Supp. 495, 503–07 (D.Md.1974) (failure to explain to plaintiff his rights under FELA a material fact in determining validity of release of claims).

Finally, one of the major factors bearing upon the question of free consent here may have aggravated coercive pressure, rather than mitigating it: sentence was still pending at the time the interview

---

**3.** Before the beating, Jones had been confined in the segregation facility in connection with an altercation over a pillow. Pp. 83–85.

**4.** The circumstances of Jones' confinement, as reflected in the deposition, should be considered on remand with reference to a possible atmosphere of coercion that may undercut the validity of the release.

Tank B is technically considered a segregation facility rather than solitary confinement. All the prisoners there were kept in separate and nonadjacent cells, and were at times allowed short walks back and forth outside their cells, but were not allowed to stop and talk; conversation was restricted to what was possible in passing. While in their cells, the Tank B prisoners could either communicate between

cells by yelling, which allegedly impeded conversation about legal or other subjects, or by yelling into the ventilator system, which was against the rules. Pp. 41–45.

**5.** The coercive atmosphere of the segregation facility, while possibly justified for disciplinary reasons, is significant for purposes of evaluating the waiver because it included instances of possible duress or pressure that relate to the waiver very specifically. Jones testified repeatedly that he felt refusal to sign the waiver would cause him to be more harshly treated by authorities, either in connection with sentencing or treatment by guards. Pp. 31, 59–61, 65, 67, 73–75, 82–83.

took place.[6] *See Boyd, supra,* 513 F.2d at 85.

For these reasons we conclude that there is a triable issue of fact as to the validity of the release relied upon by the county.[7]

REVERSED and REMANDED for further proceedings.

---

**6.** *See* pp. 60–61, 73–75, 82–83.

**7.** We reject the county's contention that Jones subsequently ratified the release by failing to tender the $500 that he had received as consideration for signing the release. There is no district court finding or evidence in the record that the retention of the $500 was any more knowing than the signing of the release. More-over, the county has not shown that it was prejudiced in its defense of the original claim by Jones' inaction. *See McCarthy v. Cahill,* 249 F.Supp. 194, 196 (D.D.C.1966).

In any event, our analysis indicates why this circumstance does not by itself settle the question of the release's validity.