**Grady M. STROMAN,**
**Plaintiff–Appellee,**

v.

**WEST COAST GROCERY COMPANY,**
**Defendant–Appellant.**

No. 88–3815.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 12, 1989.

Decided Aug. 31, 1989.

manner with the right of another to occupy a dwelling.

Timothy J. Whitters, Seattle, Wash., for defendant-appellant.

J. Michael Gallagher, Seattle, Wash., for plaintiff-appellee.

Before WRIGHT, TANG and WIGGINS, Circuit Judges.

WIGGINS, Circuit Judge:

West Coast Grocery Company (West Coast) appeals from a judgment entered against it after a bench trial in this action under 42 U.S.C. § 2000e (1982) brought by appellee Grady Michael Stroman. The district court held that Stroman was denied training for a supervisory position because he was black. The court also held that Stroman was constructively discharged as a result of the actions of several of Stroman's supervisors. The court awarded Stroman $291,445.88 in back and front pay. We reverse the district court's judgment because Stroman's suit was barred by the terms of the release agreement entered into by Stroman and West Coast.

I

Stroman began working with West Coast as a part time order selector on January 15, 1981. Stroman's job as an order selector consisted of identifying pallets of groceries in West Coast's warehouse and transporting the pallets to different shipping locations throughout the warehouse. He was switched to full time on September 28, 1981.

Beginning in early 1982 Stroman made repeated requests to be trained for a position as a grocery warehouse supervisor in the scheduling office. An employee generally had to be recommended by his supervisors for training in the scheduling office. Stroman's supervisors declined to recommend him for training.

Stroman applied and was interviewed for a supervisor position in the scheduling office in April 1985. He was not selected. As a result of his failure to obtain the position, Stroman filed a discrimination charge with the Washington State Human Rights Commission (WSHRC) and the Equal Employment Opportunity Commission (EEOC) alleging that he was denied the position because of his race. On June 12, 1985, Stroman filed a second discrimination charge alleging retaliation because of the previous charge. In July 1985 Stroman again applied for a supervisor position, but was not selected.

Stroman sought and obtained a voluntary medical leave of absence on August 5, 1985. In late October 1985, Stroman approached his supervisor Willy Mosley regarding the possibility of being put on economic layoff so that he could receive unemployment benefits. Although the economic layoff was meant only for part time employees, West Coast agreed to place Stroman on economic layoff status. In exchange West Coast required Stroman to enter into the following agreement:

West Coast Grocery and Grady Michael Stroman agree to the following:

1. Mike will leave the Company on an economic lay-off.

2. West Coast will not contest the unemployment benefits.

3. The employee's record will be cleared and information given out limited to date of hire, rate of pay, and journeyman status.

4. The employee will have no recall rights.

5. The employee will be entitled to any accrued vacation and his share of Profit Sharing payable as defined by Federal law, and the terms of the Profit Sharing Trust.

6. These terms represent a full and final settlement of any and all claims arising out of Mike's employment with West Coast Grocery.

The agreement, dated November 1, 1985, was signed by Stroman, Mosley, and David Hamlin, the Operations Manager for West Coast.

On December 2, 1985, Stroman filed a third discrimination charge alleging that West Coast failed to promote Stroman to the July 1985 supervisor position because of his race. Stroman filed this suit on July 31, 1986, alleging that he was denied training and promotion because of his race. He also stated a claim of retaliation and constructive discharge. During trial, the district court held that the November 1, 1985, agreement was a "termination of work" agreement and not a release of claims against West Coast. The court apparently based its conclusion on the fact that Stroman was still employed when he signed the agreement and no lawyers had yet become involved, and also because the statement contained in paragraph six that the agreement represented a "full and final settlement of any and all claims" did not explicitly mention Title VII. Concluding that it was a termination of work agreement, the court held that the agreement was admissible only to show discriminatory intent. *See, Cassino v. Reichhold Chemicals, Inc.,* 817 F.2d 1338, 1342 (9th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 785, 98 L.Ed.2d 870 (1988).

The district court further held that West Coast's decision not to train Stroman was racially motivated, and that Stroman was constructively discharged because of the actions and conduct of West Coast. The court awarded Stroman $101,372.48 in back pay. The court also awarded Stroman $190,073.40 in front pay "due to corporate hostility" toward Stroman. This timely appeal followed. We have jurisdiction over this action under 28 U.S.C. § 1291 (1982).

II

"A general release of Title VII claims does not ordinarily violate public policy. To the contrary, public policy favors volun-

tary settlement of employment discrimination claims brought under Title VII." [1] *Rogers v. General Elec. Co.*, 781 F.2d 452, 454 (5th Cir.1986) (citations omitted); *cf. Ahern v. Central Pac. Freight Lines*, 846 F.2d 47, 48 (9th Cir.1988) (noting "overriding public interest in settling and quieting litigation" in action for securities and RICO violations). We nevertheless must closely scrutinize a waiver of rights under Title VII because of their remedial nature. *See Freeman v. Motor Convoy, Inc.*, 700 F.2d 1339, 1352 (11th Cir.1983).

■ The interpretation and validity of a release of claims under Title VII is governed by federal law. *See Salmeron v. United States*, 724 F.2d 1357, 1361 (9th Cir.1983); *see also Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207, 1209 (5th Cir.1981) ("Creation of a federal rule rather than absorption of a state rule is appropriate where ... the rights of the litigants and the operative legal policies derive from a federal source."); *cf. Jones v. Taber*, 648 F.2d 1201, 1203 (9th Cir.1981) (federal law governs waiver of section 1983 claim). We first consider whether the agreement is properly interpreted as a termination of work agreement as the district court held, or whether as West Coast argues the agreement constitutes a valid waiver by Stroman of all legal claims against West Coast.

■ The district court's conclusion that the November 1, 1985, agreement did not constitute a release of all claims against West Coast was based primarily on an analysis of the contract provisions. We therefore review the district court's determination de novo. *See Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 367–68 (9th Cir.1985); *see also Marchese v. Shearson Hayden Stone, Inc.*, 734 F.2d 414, 417 (9th Cir.1984). We conclude that the agreement constitutes a clear and unambiguous waiver by Stroman of all legal claims against West Coast. Under the terms of the agree-

ment, West Coast agreed to allow Stroman to leave the company on economic layoff so that he could collect unemployment benefits, clear Stroman's record, and limit the information given to prospective employers to the date of hire, rate of pay, and journeyman status. In exchange, Stroman agreed that the agreement would represent "a full and final settlement of any and all claims" arising out of his employment with West Coast. This language unambiguously indicates that Stroman intended to waive all claims against West Coast, including those then pending before the WSHRC and the EEOC.

The district court cited three reasons in support of its conclusion that the agreement was not a release of claims against West Coast. First, it relied on the absence of any mention of Title VII in paragraph six of the agreement. Contrary to the district court's conclusion, an agreement need not specifically recite the particular claims waived in order to be effective. The fact that Stroman's prior claims involved employment discrimination shows an intent to release Title VII claims under the agreement. The district court also based its interpretation of the agreement as a termination of work agreement on the fact that Stroman was still employed by West Coast when he signed the agreement. We fail to see the relevance of Stroman's work status in light of the unambiguous language of the contract. We do not believe that whether Stroman was technically still employed when he signed the agreement has any bearing on the agreement's interpretation. We reach the same conclusion with respect to the district court's observation that no lawyers were consulted in the drafting of the agreement. In any event, the district court's reasoning—that the absence of lawyers indicates that the agreement was not intended to relate to Stroman's legal claims—is undercut by Mos-

---

1. Whether "policies underlying [a federal] statute ... render [a] waiver unenforceable is a question of federal law." *Newton v. Rumery*, 480 U.S. 386, 392, 107 S.Ct. 1187, 1192, 94 L.Ed.2d 405 (1987). "[A] promise is unenforceable if the interest in its enforcement is out-

weighed in the circumstances by a public policy harmed by enforcement of the agreement." *Id.* (footnote omitted).

We perceive no public policy that would be harmed by enforcement of the November 1, 1985, agreement.

ley's testimony at trial that he was aware of the substantive aspect of Title VII, although he did not know it by that name.

Our holding in *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338 (9th Cir. 1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 785, 98 L.Ed.2d 870 (1988), has little relevance to this case. In *Cassino* we concluded that a "settlement agreement and General Release" was properly admitted by the district court under Fed.R.Evid. 408 as probative of the issue of discrimination. *Id.* at 1342. For whatever reason, whether the plaintiff's suit was barred by the release was not at issue.[2] Here, the court erred in holding that the agreement was probative only of discrimination. The validly executed document should have been interpreted as a release barring the suit. *Cassino* is irrelevant to this case based on our holding that the agreement constitutes a release of Stroman's legal claims.

Our conclusion that the November 1, 1985, agreement constitutes a release of all Stroman's legal claims does not end the inquiry. We must also determine whether Stroman's release of his discrimination claims was a "voluntary, deliberate and informed" waiver. *Salmeron*, 724 F.2d at 1361; *Taber*, 648 F.2d at 1203; *see also Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 52 n. 15, 94 S.Ct. 1011, 1021 n. 15, 39 L.Ed.2d 147 (1974). The district court's findings pertaining to whether Stroman's waiver is valid are reviewed under the clearly erroneous standard. *See Ahern*, 846 F.2d at 48; (citing *Worthy*, 756 F.2d at 1372).

■ The determination of whether a waiver of Title VII was "voluntary, deliberate, and informed" is "predicated upon an evaluation of several indicia arising from the circumstances and conditions under which the release was executed." *Coventry v. United States Steel Corp.*, 856 F.2d 514, 522 (3d Cir.1988); *see Salmeron*, 724 F.2d at 1362 (whether a release was voluntary must be determined from all the circumstances); *Taber*, 648 F.2d at 1203

(whether release was voluntary depends on both objective and subjective factors). Of primary importance in this calculation is the clarity and lack of ambiguity of the agreement, *see Coventry*, 856 F.2d at 522; *Rogers*, 781 F.2d at 455–56, the plaintiff's education and business experience, *see Coventry*, 856 F.2d at 523 (quoting *EEOC v. American Express Publishing Corp.*, 681 F.Supp. 216, 219 (S.D.N.Y.1988)), "the presence of a noncoercive atmosphere for the execution of the release," *Taber*, 648 F.2d at 1204; *see also Salmeron*, 724 F.2d at 1362; *Coventry*, 856 F.2d at 523, and whether the employee had the benefit of legal counsel, *see Salmeron*, 724 F.2d at 1362; *Taber*, 648 F.2d at 1205; *Coventry*, 856 F.2d at 523.

Based on his ruling that the agreement was a termination of work agreement, the district court precluded West Coast's counsel from examining either Stroman or Mosley regarding the conditions under which the agreement was signed. The court did, however, permit West Coast's counsel to make an offer of proof incorporating Mosley's affidavit. We conclude that the record as a whole sufficiently establishes the voluntariness of the agreement and no purpose would be served by remanding the case to the district court to reconsider this issue.

■ We are satisfied that Stroman's release of "all claims" against West Coast under the November 1, 1985, agreement was a deliberate, voluntary, and knowing waiver of his Title VII and related claims. As we have previously indicated, the sixth paragraph of the agreement unambiguously indicates that Stroman intended to waive all legal claims against West Coast. We note that Stroman's work experience and college education were particularly relevant to our determination of a knowing and voluntary waiver. Although Stroman was not a sophisticated businessman, his training in the Army and his business management-related community college degree convince us that Stroman possessed the

---

2. The document was never signed. *Cassino*, 817 F.2d at 1341–42.

education and skills necessary to understand that when he signed the agreement he waived all legal claims against West Coast.[3] He was sufficiently intelligent to understand that "all claims" meant all legal claims, including claims brought under Title VII.

Additionally, there is no evidence whatsoever that Stroman was coerced into signing the agreement. To the contrary, it was Stroman who approached Mosley asking to be placed on economic layoff. When the agreement initially was presented to Stroman, he was not coerced into signing it. In fact, Stroman did not sign it until several days later. Although he did not have an attorney read the agreement before signing it, there is no evidence indicating that Stroman was discouraged or precluded from doing so. In fact, Mosley, who was not permitted by the district judge to testify on this issue, indicated in his affidavit that he asked Stroman whether he wished to have an attorney read the agreement before signing and that Stroman responded that he did not. We therefore conclude that the contractual agreement released Stroman's Title VII discrimination claims, and that the release was a deliberate and informed waiver.

### III

For the foregoing reasons, we reverse the district court's judgment in favor of Stroman and order that judgment be entered in favor of West Coast and the action dismissed.[4]

REVERSED

TANG, Circuit Judge, dissenting in part:

I agree that the economic layoff agreement was sufficient to waive Stroman's Title VII claims. I dissent, however, from the majority's factual determination that Stroman waived his Title VII rights knowingly and voluntarily.

When an appellate court determines that a lower court made findings based upon an erroneous view of the law, the appellate court may not make contrary findings but must remand for new findings to be made in the light of the correct rule of law. *Pullman–Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). This is not a game where an incorrect understanding of the law by the fact finder results in automatic granting of relief. Such a rule would require inefficient use of limited resources because the district court would have to make factual determinations in every case regardless of whether they are needed.

The only exception to that rule is if "the record permits only one resolution of the factual issue". *Id.* citing *Kelley v. Southern Pacific Co.,* 419 U.S. 318, 331–332, 95 S.Ct. 472, 479–80, 42 L.Ed.2d 498 (1974). The majority presumes that Stroman waived his Title VII rights knowingly and voluntarily but I do not believe that the record permits only one conclusion as to this matter.

I would therefore remand for a determination as to whether the waiver of Title VII rights was made knowingly and voluntarily. It is the fact-finder, not us, who should determine these issues in the first instance.

---

3. Significantly, Stroman relied on this background in applying for a supervisory position at West Coast.

4. Because we hold that the November 1, 1985, agreement bars this suit, we need not address West Coast's other arguments.