**In re SLM INTERNATIONAL, INC.; Sport Maska Inc.; Maska U.S., Inc., # 1 Apparel, Inc.; # 1 Apparel Canada Inc.; St. Lawrence Manufacturing Canada Inc.; and Mitchel & King Skates Limited, Reorganized Debtors.**

**T. Copeland and Sons, et ano., Appellants,**

v.

**SLM International, Inc., et al., Appellees.**

**No. CA99–51 SLR.**

United States District Court, D. Delaware.

May 1, 2000.

Laurie Selber Silverstein, William A. Hazeltine, Potter Anderson & Corroon LLP, Wilmington, Delaware, for appellants, Andre D. Bouffard, R. Bradford Fawley, Downs Rachlin & Martin, PLLC, Brattleboro, Vermont, of counsel.

Teresa K.D. Currier, Duane, Morris & Heckscher, LLP, Wilmington, Delaware, for appellees, Kenneth H. Eckstein, Philip Bentley, Kramer Levin Naftalis & Frankel LLP, New York City, of counsel.

## OPINION

ROBINSON, District Judge.

### I. INTRODUCTION

Currently before the court is the appeal of T. Copeland & Sons ("Copeland") from two bankruptcy court orders sustaining Joint Objection to Copeland's secured claim against the estate. Jurisdiction was proper in the bankruptcy court under 28 U.S.C. § 157 as a core proceeding arising under Title 11 of the U.S. Code. This court has jurisdiction over Copeland's appeal pursuant to 28 U.S.C. § 158(a). For the following reasons, the court shall vacate the bankruptcy court's order and remand this matter for an evidentiary hearing.

### II. BACKGROUND

The reorganized debtors manufacture sporting goods equipment. SLM International is the holding company for Maska U.S., Inc. ("Maska"). This present matter has its genesis in a 1992 Vermont state court suit initiated by Copeland against Maska. Because the consequences of this suit play an important role in the resolution of the issues at bar, the court will discuss its history in some detail.

Except where otherwise indicated, the underlying facts are not in dispute. Copeland filed suit against Maska in the Superior Court of Orange County, Vermont seeking damages for a leakage of toxic dry cleaning fluids on to Copeland property from an adjoining Maska facility. In June 1995, after jury selection began, Maska initiated settlement negotiations with Copeland. Due to financial problems, Maska could not settle the entire suit for cash. So, it offered Copeland a $1 million "up front" cash payment and a $6 million promissory note to settle the litigation. (D.I. 10 at A333–36) Copeland insisted upon a secured lien against Maska's inventory, accounts receivable, or some other marketable asset as collateral for the promissory note. Maska, however, indicated that its lenders already had perfected security interests in all of its tangible assets. After further negotiation, Copeland and Maska agreed upon a settlement consisting of a $7 million obligation, with $1 million to be paid in cash within several weeks of the settlement and the remaining

$6 million to be paid pursuant to a term note over five years. (D.I. 10 at A658–59) At the time of the settlement, Maska had initiated in the District of Vermont a suit against its insurers for failure to indemnify it for fines and claims arising out of the environmental contamination at its Vermont facility. Maska and Copeland also agreed as part of their settlement package that Maska would pay to Copeland any and all of the cash judgment (if any) generated by this litigation up to any outstanding balance on the $6 million note. (D.I. 10 at A341)

Maska paid Copeland the initial $1 million but defaulted on the promissory note by failing to comply with certain of its provisions not presently at issue. As a result, Copeland petitioned the New Hampshire Superior Court for an *ex parte* attachment of inventory located at Maska's Peterborough, New Hampshire warehouse. On October 19, 1995, the New Hampshire court granted Copeland's *ex parte* writ of attachment, which Copeland attempted to perfect by filing with the New Hampshire Secretary of State and with the Peterborough Town Clerk's office. Law enforcement officials from the State of New Hampshire subsequently executed the attachment.

On October 24, 1995, shortly after the attachment, Copeland received notice that Maska had filed for bankruptcy in the District of Delaware. Realizing that the attachment was likely a voidable preference, Copeland's president, Timothy E. Copeland, attended the formation meeting of the Unsecured Creditors' Committee on November 3, 1995, hoping to obtain a seat on the Committee. In an affidavit filed with the bankruptcy court, John D. McLaughlin, Jr. (a representative of the U.S. Trustee's Office) testified that he informed Mr. Copeland that, to obtain a seat on the committee, he would have to waive, "what I considered to be[ ] a large secured claim." (D.I. 10 at A88, ¶ 11) McLaughlin's affidavit does not specify the nature of this secured claim. After suggesting that

Copeland waive this unspecified secured claim, Mr. Copeland orally agreed to the waiver after consulting with his attorneys. Mr. McLaughlin requested a written memorialization of the waiver and, to this end, Mr. Copeland wrote in his own hand the following waiver:

> T. Copeland & Sons & Copeland Properties, Inc. waives [sic] any claim that it holds a secured claim in these proceedings.

(D.I. 10 at A93) Mr. Copeland signed the waiver twice—once as president of Copeland Properties and once as president of T. Copeland & Sons. As will become apparent, the parties vehemently disagree as to the scope of this waiver. Copeland argues that Mr. Copeland only intended to waive his lien on the Peterborough inventory and not his equitable lien on the Vermont insurance litigation proceeds. The reorganized debtors contend that the written waiver is an unambiguous waiver of "any" claim that Copeland held in the bankruptcy proceeding—including any lien on the Vermont insurance litigation proceeds. In his affidavit, McLaughlin states that, "I subjectively believed that Copeland had waived all secured claims against the estates of any nature whatsoever." (D.I. 10 at A89)

Whatever the scope of Copeland's waiver, Mr. McLaughlin appointed Mr. Copeland to the Unsecured Creditors' Committee. On May 14, 1996, Copeland filed a Proof of Claim in the SLM bankruptcy asserting an equitable lien in Maska's insurance litigation recoveries. (D.I. 10 at A5–14f) The Proof of Claim stated in pertinent part as follows:

> The Insurance Litigation is still pending. If the insurers prevail in the litigation, Maska and SLM will recover nothing and Claimants will have no security for satisfaction of their claim. Conversely, if Maska and SLM prevail in the litigation and recover money from their insurers, Claimants will have an equitable lien in and to these monies, providing security to Claimants for the payment of

their claim to the extent of the recovery against the insurers. (D.I. 10 at A6) No objection was filed to this Proof of Claim for over two and a half years.[1] In the meantime, the bankruptcy court confirmed the Debtors' First Amended Joint Chapter 11 Plan ("the Plan") on January 23, 1997. (D.I. 10 at A30–69 (Order confirming the Plan)) The Plan created three classes of general unsecured creditors: Class 6 "Senior Note Claims;" Class 7 "Maska U.S. Unsecured Claims;" and Class 8 "Non–Maska Unsecured Claims."[2] (D.I. 10 at A35) Copeland subsequently amended and bifurcated its Proof of Claim to conform with the enumerated classes of claims. Accordingly, Copeland filed an Amended Proof of Claim of Holder of Maska U.S. Unsecured Claim ("the Class 7 claim") and an Amended Proof of Claim of Holder of Other Secured Claim (the "Other Secured Claim"). (D.I. 10 at A15–29a, 140–43) No objection was filed to Copeland's Class 7 claim, and Copeland received its pro rata share of Class 7 stock, which it cashed for approximately $2.6 million.[3] The Other Secured Claim asserted a secured claim based on the alleged equitable lien on Maska's insurance litigation proceeds.[4] It sought approximately $6.3 million, which included $2.25 million in post-petition interest, collection costs, and fees. The validity of the Other Secured Claim is at the heart of the present dispute.

With respect to the Other Secured Claim on the insurance litigation proceeds, Maska's suit against its insurers commenced in the District of Vermont on June 29, 1998. Maska sought damages from its insurers to cover the various environmental costs it had incurred, including the $1 million paid to Copeland prior to bankruptcy, the $2.6 million unsecured claim paid to Copeland in bankruptcy, $5 million in defense costs, and $3 million in environmental clean-up costs. (D.I. 12 at 8) Maska also sought recovery for contingent financial obligations such as Copeland's disputed Other Secured Claim. Significantly, Maska asked Mr. Copeland to testify at trial about his companies' claims against Maska. Maska's trial counsel claims to have had no knowledge of Mr. Copeland's written waiver of "any ... secured claim" in the Maska bankruptcy and that, if she had, she never would have presented evidence of Copeland's claim.

On July 8, 1998, the jury, which returned a special interrogatory, awarded Maska approximately $9.1 million for property damage for which it was "legally obligated" to pay third parties like Copeland. Of this, the jury awarded $1 million for Maska's pre-bankruptcy payment to Copeland but, apparently, nothing for Copeland's Other Secured Claim. (D.I. 10 at A308)

Shortly after the verdict in Maska's insurance suit, the reorganized debtors and the Unsecured Creditors' Committee (collectively, "the Joint Objectors") filed a Joint Objection to Copeland's Other Secured Claim on July 13, 1998. (D.I. 10 at

---

1. Both Copeland and the debtors agreed to defer litigation over the validity of Copeland's secured claim until after resolution of the bankruptcy proceedings. (D.I. 10 at A258–59; D.I. 13 at B156)

2. The Plan also contained a Term Sheet in which Copeland and the Noteholder members of the Unsecured Creditors Committee settled a number of intercreditor disputes. Among the agreements, the Term Sheet provided that, "[t]he Noteholders and Copeland agree that neither party will object to the Plan or in any way seek to avoid or otherwise challenge the claims of each party." (D.I. 10 at A209)

3. Apparently, the debtors did not dispute that Copeland had "at least a general unsecured claim" in the amount of $2,619,474.80. (D.I. 10 at A112)

4. The First Amended Disclosure Statement notes that: "The Debtors believe that there are no Other Secured Claims. Two holders of Maska U.S. Unsecured Claims have asserted an equitable lien on proceeds of Maska U.S.'s Insurance Litigation. The Debtors believe that no such equitable lien exists and, if presented, intend to defend vigorously." (D.I. 13 at B244)

A70–83) The Joint Objectors asserted several grounds for disallowance of Copeland's Other Secured Claim. First, the Joint Objectors argued that Copeland waived its lien on the insurance litigation proceeds. Second, they suggested that the doctrine of judicial estoppel precluded Copeland's claim because Copeland had a duty to disclose to the U.S. Trustee any secured interest it wished to "carve out" of its waiver. The Joint Objectors also sought disallowance on the grounds that the Maska–Copeland settlement agreement did not create an equitable lien in Copeland's favor and, even if it had, that lien would be defeated by the avoiding powers of 28 U.S.C. § 544(a) and by a perfected senior lien previously granted to Maska's noteholders. On August 26, 1998, Copeland filed a motion to dismiss the Joint Objection claiming that the Unsecured Creditors's Committee never authorized the objection, that the objection was not in the Unsecured Creditors' best interests and that the Joint Objection was barred by the Committee's intercreditor settlement agreement with Copeland. (D.I. 10 at A97–151) Copeland also filed a response to the Joint Objection in which it argued, *inter alia*, that Maska was judicially estopped from arguing waiver because it admitted during the Vermont insurance litigation that Copeland's claim was valid. (D.I. 10 at A152–218)

Following the submission of the Joint Objection and Copeland's motion to dismiss, the procedural history becomes a bit muddied. Apparently, the bankruptcy court held a teleconference with the parties on September 2, 1998 in which it suggested that the parties, in an upcoming hearing on the Joint Objection, address only the threshold issues of waiver and judicial estoppel.[5] (D.I. 10 at A220) The court apparently indicated that it would address all other issues—including testimony on the waiver issue—at a later hearing if it did not issue a dispositive ruling on the Joint Objection at the first hearing.

Prior to the first hearing, Copeland filed an affidavit by Mr. Copeland with the bankruptcy court in which he explained (1) that he intended to waive only Copeland's secured claim in the Peterborough inventory and not "any" of Copeland's other secured claims and (2) that he thought this was obvious to Mr. McLaughlin. The Joint Objectors submitted an affidavit by Mr. McLaughlin in which he stated that he "subjectively believed that Copeland had waived all secured claims against the estates of any nature whatsoever." (D.I. 10 at A89) Also prior to the hearing, Copeland conducted and submitted in evidence a Rule 30(b)(6) deposition of Maska's designated corporate representative, which allegedly supports Copeland's judicial estoppel argument. The Joint Objectors filed an "Initial Reply" to Copeland's response to the Joint Objection. In this reply, the Joint Objectors raised for the first time the parol evidence rule as support for their argument that Copeland had waived its claim to the insurance litigation proceeds.

On September 17, 1998, the bankruptcy court heard oral argument on the waiver and judicial estoppel issues. Both parties rested on various documents (including the record of the insurance trial), the 30(b)(6) deposition, and the Copeland and McLaughlin affidavits. The bankruptcy court issued two orders on October 29, 1998 granting the Joint Objection and disallowing Copeland's Other Secured Claim for the insurance litigation proceeds. (D.I. 10 at A657–62) One order relating to the debtors' objection sets forth findings of fact and conclusions of law while the other

---

5. The transcript of this teleconference, if one exists, was not made part of the record on appeal. Copeland argues that the bankruptcy court indicated that it would treat the waiver and judicial estoppel arguments in "summary judgment fashion" and would hold a hearing to determine whether there were any genuine issues of material fact in dispute. There is no indication in the record, however, that the bankruptcy court proceeded in summary judgment fashion and, moreover, the bankruptcy court's orders do not grant or deny summary judgment.

order sustains the objection of the Unsecured Creditors' Committee on the grounds set forth in the longer order.

In the longer order, the bankruptcy court concluded that Mr. Copeland's written waiver of "any claim" in the Chapter 11 proceedings was an unambiguous waiver of all claims and not simply a waiver of a secured claim in the Peterborough inventory. Further, the court rejected Copeland's argument that the debtors were estopped from arguing waiver. In reaching this conclusion, the bankruptcy court cited only an excerpt of Maska's closing argument during the Vermont trial and disposed of Copeland's judicial estoppel argument with the following observation:

> The transcript of that closing argument shows that [Maska's trial counsel] stated to the jury that "Mr. Copeland ... is still looking for, he is still claiming against Maska, $6,269,153." ... This was based on [Maska's trial counsel's] understanding that Copeland still asserted a secured claim against Maska for the $6 million amount plus interest.

(D.I. 10 at A661) Based solely on this evidence, the bankruptcy court rejected Copeland's judicial estoppel argument.

On appeal, Copeland raises essentially two grounds for reversal. First, it argues that the bankruptcy court erred by finding Mr. Copeland's written waiver an unambiguous waiver of all of Copeland's claims in the Chapter 11 proceeding. Copeland contends that the bankruptcy court should have considered Mr. Copeland's intent and the circumstances surrounding the waiver. As a second ground for reversal, Copeland points to the bankruptcy court's refusal to judicially estop the Joint Objectors from arguing waiver.

## III. STANDARD OF REVIEW

■ As an initial matter, the court notes that, contrary to Copeland's assertions, the bankruptcy court did not enter a summary judgment order. Instead, that court merely ruled on the Joint Objection to Copeland's Other Secured Claim. As

such, the standard rules for appellate review of a bankruptcy court ruling apply. Under Bankruptcy Rule 8013, a district court reviewing an appeal of a bankruptcy court's findings of fact may not set aside those findings unless clearly erroneous. Conversely, a bankruptcy court's conclusions of law are reviewed *de novo*. *See Anes v. Dehart (In re Anes)*, 195 F.3d 177, 180 (3d Cir.1999).

## IV. DISCUSSION

### A. Copeland's Outstanding Motion to Dismiss

As an initial matter, the court notes that Copeland filed a motion to dismiss the Joint Objection in which it argued, *inter alia*, that the Unsecured Creditors' Committee lacked standing to file the Joint Objection and that the Committee waived any objection to Copeland's claim by virtue of the intercreditor settlement agreement it reached with Copeland. If true, these arguments would preclude consideration of the Joint Objection at all. The bankruptcy court, however, never considered or ruled on this motion. Accordingly, the court shall remand for consideration of Copeland's motion to dismiss.

### B. The Bankruptcy Court's Resolution of the Waiver Issue

■ In its order, the bankruptcy court found Mr. Copeland's written waiver to be an "unambiguous" waiver of "any" of Copeland's secured claims in the Chapter 11 proceedings. Because it found the waiver unambiguous, the bankruptcy court refused to consider extrinsic evidence of intent or of the circumstances surrounding the waiver. At issue is whether the bankruptcy court should have considered such extrinsic evidence. Because this is a purely legal question, the court shall review the bankruptcy court's ruling *de novo*.

■ Both parties argue strenuously for and against application of the parol evidence rule. The bankruptcy court,

however, did not explicitly apply the parol evidence rule in reaching its decision. Even if it did, the rule is inapplicable to Mr. Copeland's written waiver. The parol evidence rule is not a rule of evidence; rather, it is a rule of substantive contract law that bars evidence of prior or contemporaneous agreements or negotiations that contradict the terms of an integrated, complete writing. *See* Restatement (Second) of Contracts § 215 (1981). Here, not even the Joint Objectors argue that the waiver constituted a contract between Mr. Copeland and Mr. McLaughlin and, moreover, Copeland is not arguing for the admission of extrinsic evidence of a "prior or contemporaneous agreement" to alter the terms of the waiver. Instead, Copeland argues that the bankruptcy court erred by not considering extrinsic evidence of Mr. Copeland's state of mind at the time he signed the allegedly all encompassing waiver of Copeland's secured claims. Thus, the court must look to the law of waiver, not the parol evidence rule, to determine whether the bankruptcy court erred in confining its analysis to the face of Mr. Copeland's written waiver.

■■■ The most widely employed definition of waiver was enunciated by the United States Supreme Court in *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), a case concerning a criminal defendant's waiver of counsel. In that case, the Supreme Court explained that, "[a] waiver is ordinarily an intentional relinquishment of a known right or privilege." *Id.* at 464, 58 S.Ct. 1019. To assess whether an individual intentionally relinquished a known right or privilege, a court must examine "the particular facts and circumstances surrounding th[e] case, including the background, experience, and conduct of the accused." *Id.*

The Supreme Court has imported this "totality of the circumstances" test into other areas of the law. For instance, in

*Coventry v. United States Steel Corp.,* 856 F.2d 514, 523–25 (3d Cir.1988), the Third Circuit reversed a district court finding that an employee waived his right to sue his employer under the Age Discrimination in Employment Act, where the district court did not conduct a "totality of the circumstances" review to determine the voluntariness of the waiver.[6] Significantly for present purposes, the court ruled that the voluntariness inquiry must entail more than a mere "determination that the release was written in clear, specific language and that [the plaintiff] was competent enough to read and understand its literal meaning." *Id.* at 524. Other circuits have adopted the "totality of the circumstances test" for ADEA waivers of suit. *See Pierce v. Atchison Topeka & Santa Fe Ry. Co.,* 110 F.3d 431, 442 (7th Cir.1997) (adopting the totality of the circumstances test and noting that, "[t]he inquiry into whether a waiver of ADEA rights was knowing and voluntary is, at bottom, an inquiry into the mental state of the party who is purported to have waived those rights"); *Gormin v. Brown–Forman Corp.,* 963 F.2d 323, 327 (11th Cir.1992); *Torrez v. Public Serv. of New Mexico, Inc.,* 908 F.2d 687 (10th Cir.1990); *O'Hare v. Global Natural Resources, Inc.,* 898 F.2d 1015, 1016 (5th Cir.1990); *Stroman v. West Coast Grocery Co.,* 884 F.2d 458, 461 (9th Cir.1989).

■■■ Of particular importance to the present case, the Supreme Court has noted specifically in the bankruptcy context that, "[i]n determining whether a waiver of liens has taken place, the bankruptcy court must ... look to the equities involved as well as to the intention of the parties." *United States Bank v. Chase National Bank,* 331 U.S. 28, 36, 67 S.Ct. 1041, 91 L.Ed. 1320 (1947). In *Chase National Bank,* the Supreme Court addressed the question of whether two secured lien creditors waived their liens by participating in

---

6. Employees may waive their federal ADEA rights in private settlements with their employers, provided that their consent to a release is both knowing and voluntary. *See Alexander v. Gardner–Denver,* 415 U.S. 36, 52 n. 15, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

dividends distributed to unsecured creditors. Although, as the Court noted, "[i]t is generally true that participation by a secured creditor in distributions from the general assets on the basis of his full claim indicates a waiver of the security and an election to be treated as an unsecured creditor," the Court refused to apply this nonstatutory rule without regard to the equities of the case or to the intent of the secured creditors who received dividends from the general assets. *Id.* at 35–36, 67 S.Ct. 1041. The Court explained that "'courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity'." *Id.* at 36, 67 S.Ct. 1041 (citations omitted). Therefore, bankruptcy courts must assess, *inter alia,* whether a waiver would be inequitable or unfair to the secured creditor, whether the waiver was made under a mistake of law or fact, or whether the objecting party is estopped from questioning the validity of the liens. *See id.*

■ Thus, the law of waiver required the bankruptcy court to go beyond a cursory, "plain meaning" examination of Mr. Copeland's written waiver. It should have inquired into the circumstances surrounding Mr. Copeland's waiver to determine whether Mr. Copeland knew he was waiving his companies' secured claim in the pending Vermont insurance litigation. Because the bankruptcy court failed to do so, its order must be vacated and the matter remanded to the bankruptcy court for an evidentiary hearing.

## C. The Judicial Estoppel Issue

■ The bankruptcy court refused to judicially estop the Joint Objectors from raising their waiver argument. Application of the doctrine of judicial estoppel entails a two-part inquiry:

(1) is [the] present position [of the party sought to be estopped] inconsistent with the position it asserted in [the prior] proceedings; and (2) if so, did [that] party assert either·or both of the inconsistent positions in bad faith—i.e., with

intent to play fast and loose with the court. Only if both prongs are satisfied is judicial estoppel an appropriate remedy.

*Ryan Operations G.P. v. Santiam–Midwest Lumber Co.,* 81 F.3d 355, 361 (3d Cir.1996). The doctrine does not require that a party must have benefitted from the prior position in order to be judicially estopped in a subsequent proceeding. *See id.* Copeland argues that the bankruptcy court erred by ignoring evidence indicating that Maska had taken two inconsistent positions before two federal courts with an "intent to play fast and loose" with both courts.

The evidence before the bankruptcy court establishes that Maska sought compensation from the Vermont jury for Copeland's $6,269,153 Other Secured Claim. Maska's trial counsel explained in detail to the Vermont jury that Maska had paid Copeland a $1 million cash settlement, a $2,619,474.88 claim in bankruptcy, and that "Mr. Copeland . . . is still looking for, he is still claiming against Maska, $6,269,153" plus interest. (D.I. 11 at A553–54) Moreover, Maska presented a large, demonstrative exhibit to the Vermont jury with the heading, "Indemnification Costs Copeland Claim." (D.I. 11 at A568) The exhibit itemized the Copeland claim as follows:

| | |
|---|---|
| Paid | $1,000,000.00 |
| Bankruptcy Payment | $2,619,474.88 |
| **Balance Due** | **$6,269,153.00** |
| Total | $9,888,627.88 |

(D.I. 11 at A568) (emphasis added). There was also evidence before the bankruptcy court that Maska knew of Copeland's written waiver well before the Vermont suit went to trial. For instance, Maska's counsel acknowledged the waiver in an October 17, 1996 letter to Copeland's counsel:

As you can well imagine, your letter was a surprise inasmuch as Copeland . . . waived *any* secured claim at the outset of these[ ] cases. . . .

(D.I. 11 at A365 (emphasis in. original)). This letter raises the inference that Maska knew of Copeland's waiver of "any" se-

cured claim before the Vermont trial but nonetheless sought indemnification in Vermont for Copeland's Other Secured Claim.[7]

In its order, the bankruptcy court rejected Copeland's estoppel argument after a brief, one-paragraph discussion of a single sentence of Maska's closing argument to the Vermont jury. (D.I. 10 at A661, ¶ 14) In essence, the bankruptcy court concluded that Maska was unaware of Copeland's written waiver and, therefore, did not act in bad faith when it sought indemnification for Copeland's Other Secured Claim and then later challenged the validity of that Claim before the bankruptcy court. At the very least, an evidentiary hearing would be required to reach this conclusion. Because the bankruptcy court rejected Copeland's judicial estoppel argument without such a hearing and because this court is unable to determine whether the bankruptcy court even considered the documentary evidence noted above, the court shall remand this issue to the bankruptcy court for a full evidentiary hearing.[8]

## V. CONCLUSION

For the aforementioned reasons, the bankruptcy court's order is vacated, and this matter is remanded to the bankruptcy court for further proceedings consistent with this opinion.

---

**7.** Although this October 1996 letter does not mention whether the waiver referred to was oral or written, its author's use and emphasis of the word "any," which appears in the written waiver, suggests that the author had seen the written waiver.

**8.** Copeland argues that the bankruptcy court ruled on the Joint Objection without allowing Copeland an adequate opportunity to conduct discovery. The court is confident that the bankruptcy court can fairly resolve Copeland's objections.